Frank ALSCHULER, Diane Sokolofski, Morton Weisman and the Hutchinson-Hazel-Junior Terrace Association, Plaintiffs,

v.

DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Elmer C. Binford, Lawrence B. Simons, Monterey Apartments, a California Limited Partnership, Sabina Realty Corporation, G. Bliudzius Contractors, Inc., ADC Mortgage Corporation, Ranbir S. Sahni, George Gottfried and unknown Partners of Monterey Apartments, Defendants.

No. 80 C 4595.

United States District Court,
N. D. Illinois, E. D.

June 4, 1981.

Reuben L. Hedlund and Kevin A. Russell, Hedlund, Hunter & Lynch, Chicago, Ill., for plaintiffs.

Steven A. Miller and Michael S. O'Connell, Asst. U. S. Attys., Chicago, Ill., for federal defendants.

Edna Selan Epstein, Sidley & Austin, Chicago, Ill., for private defendants.

## MEMORANDUM OPINION

BUA, District Judge.

Before the court is plaintiffs' motion for a preliminary injunction pursuant to Rule 65(a), Fed.R.Civ.P. The plaintiffs seek an order enjoining the Department of Housing and Urban Development and two of its officials from providing housing assistance payments to the owners of the Monterey Apartments on behalf of future tenants, and from providing mortgage insurance on the apartment project. The plaintiffs also seek to enjoin the developers of the Monterey Apartments from continuing rehabilitation work on the apartment buildings, since they allege that such work is proceeding in violation of a City of Chicago ordinance.

### *Procedural Background*

On August 27, 1980, plaintiffs filed a three count complaint against defendants alleging violations of the United States Housing Act of 1937 (as amended by the Housing and Community Development Act of 1974, Pub.L.No.93-383, 88 Stat. 633, and, in particular by section 201 of the Housing and Community Development Act of 1977, Pub.L.No.95-128, 91 Stat. 1111, codified in part at 42 U.S.C. § 1437f(c)(1)), section 221(d)(2) of the National Housing Act of 1934, 12 U.S.C. § 1715*l*(d)(2), Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Housing and Community

Development Act of 1974, 42 U.S.C. § 5301 *et seq.*, and the Lake Michigan and Chicago Lakefront Protection Ordinance, CHICAGO, ILL., MUNICIPAL CODE ch 194B (1979).

In essence, plaintiffs' complaint was twofold: (1) the defendant Department of Housing and Urban Development's (HUD) approval of housing assistance payments to the owners of the Monterey Apartments under the section 8 leased housing assistance payments program, 42 U.S.C. § 1437f, *see generally Holbrook v. Pitt*, 643 F.2d 1261 (7th Cir. 1981), and its provision of mortgage insurance for the Monterey Apartments pursuant to section 221(d)(4), 12 U.S.C. § 1715*l*(d)(4), was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); and (2) the private defendants violated the Lakefront Protection Ordinance by undertaking the rehabilitation of the Monterey Apartment without first having secured the approval of the Chicago Plan Commission.

On September 8, 1980, plaintiffs moved for a preliminary injunction to enjoin federal assistance to and construction of the Monterey Apartments. They claim that unless a preliminary injunction issues they will suffer irreparable injury in that the concentration of "publicly assisted, low-income, and minority persons in the Uptown area" will increase; racial and minority residential segregation will increase; and "additional strain will be placed on already burdened social services and community resources located in the Uptown area." They also contend that the provision of HUD assistance for the Monterey project will adversely affect the "special environmental, recreational, cultural, historical and aesthetic qualities of the Lake Michigan and Chicago Lakefront Protection District." *See Motion for Preliminary Injunction.*

On October 6, 1980, plaintiffs sought leave to amend their complaint to add William Duggan, Commissioner of the Department of Inspectional Services, as a defendant and to require him to revoke the building permits and issue a stop work order covering the Monterey Apartments. This issue has been fully briefed by the parties.

On October 17, 1980, private defendants moved to strike and dismiss Count III of the complaint. This issue has been fully briefed by the parties.

On October 23, 1980, private defendants, complaining that plaintiffs' lawsuit was "wholly frivolous and without merit," filed a three count counterclaim against plaintiffs alleging interference with property rights, abuse of process, and tortious interference with contract, and seeking damages in excess of one million dollars and injunctive relief.

On October 28, 1980, plaintiffs moved to dismiss private defendants' counterclaim.

On October 30, 1980, the federal defendants moved to dismiss plaintiffs' complaint. Federal defendants have filed a memorandum in support of their motion in which private defendants have joined.

On November 21, 1980, plaintiffs were given leave to file an amendment to their preliminary injunction motion to bring into issue the Monterey Apartments' compliance with the court orders in the *Gautreaux* litigation.

The preliminary injunction hearing began on November 5, 1980 and continued for eleven trial days. At the completion of the plaintiffs' case on November 26, 1980, defendants moved for a directed verdict. The court denied defendants' motion. The taking of evidence was completed on December 2, 1980. The court heard the testimony of twenty witnesses during the evidentiary hearing. Also submitted in evidence were designated portions of a number of depositions and many exhibits.

### The Parties

The plaintiffs in this case are the Hutchinson-Hazel-Junior Terrace Association and three of its members. The Association is an unincorporated voluntary membership association whose members own single family residences on R–1 zoned lots on West Hutchinson Street, North Hazel Street, West Junior Terrace and West Buena Ave-

nue in the City of Chicago. All of the members of the Association live within a two block distance from the Monterey. Frank Alschuler resides and owns property at 832 West Junior Terrace, which is approximately 150 feet west of the Monterey Apartments. Morton Weisman resides at 811 West Junior Terrace, which is directly across the street and to the south of the Monterey Apartments. Diane Sokolofski resides at 819 West Junior Terrace, which is also on the south side of the street and two lots west of the Monterey Apartments.

The members of the Association are generally upper middle and upper class families with incomes that are well above the mean and median incomes of Chicago families. Almost all of the members live in large single family homes. The individual plaintiffs valued their homes between $150,000 and $250,000. Out of over sixty families represented by the Association, all of the membership is white with the exception of one black member and one Oriental member. The only member of the Association with a child attending a Chicago Public School is plaintiff Frank Alschuler. His daughter attends Lane Technical High School which is outside of the Uptown community.

The federal defendants are the Department of Housing and Urban Development, an agency of the United States Government responsible for the administration of the rental supplements and mortgage insurance guarantees that have been promised to the private defendants, Elmer Binford and Lawrence B. Simons. Elmer Binford is sued in his capacity as Manager of the Chicago Area Office of HUD. Lawrence B. Simons is sued in his capacity as the federal housing administrator responsible for the administration of the federal mortgage insurance program.

Defendant Monterey Apartments is a California Limited Partnership, with an office at 1011 East Touhy Avenue, Suite 395, Des Plaines, Illinois 60018, and is the record title-holder of the property located at 808 and 812–814 Junior Terrace, Chicago, Illinois, which is within a Private Use Zone of the Lake Michigan and Chicago Lakefront Protection District.

Defendant Ranbir S. Sahni is the general partner and a limited partner of the partnership. He was also the sponsor with respect to the application filed by the owners of the Monterey Apartments for mortgage insurance. Sahni has an office at 1011 East Touhy Avenue, Suite 395, Des Plaines, Illinois, 60018 and is a resident of California. Sahni is also the sole shareholder and president of defendants ADC Mortgage Corporation and Sabina Realty Corporation. Ranbir Sahni has participated in the development of over sixty federally assisted housing developments across the country including four projects in the City of Chicago.

Sabina Realty is a California corporation qualified to do business in Illinois and has an office at 1011 East Touhy Avenue, Suite 395, Des Plaines, Illinois, 60018. Sabina is the Managing Agent of the Monterey development. Sabina Realty has managed other Sahni sponsored developments with general success and has on a number of occasions been requested by HUD to take over developments that were in default in order to bring properties back into a state of financial health and has done so successfully.

Defendant G. Bliudzius Contractors, Inc., an Illinois corporation, is a limited partner of Monterey Apartments and is the contractor for the rehabilitation of the Monterey buildings.

*The Property*

The property at the center of this litigation consists of two apartment buildings known as the Monterey Apartments. One is a nine-story building located at 808 West Junior Terrace. The other is an adjacent three-story building located at 812–814 West Junior Terrace. The buildings are located at the northwest corner of West Junior Terrace and North Clarendon Avenue. Both buildings are presently vacant and are undergoing substantial rehabilitation. No leases have been executed for the rental of the rehabilitated apartments in these buildings.

The nine-story building, originally constructed in the 1920's is served by one passenger elevator. It contained 141 housing units and was used in the past as an apartment/hotel. The rehabilitation plans of the defendant developers call for its conversion to seventy-nine apartments, forty-four of which will have two bedrooms, and thirty-five of which will have one bedroom. The three-story building contains three, three bedroom apartments.

Several multi-unit, multi-story buildings are adjacent to or within the geographic area encompassed by the Association; however, none of the residents of these multi-family, multi-story properties are members of the Association or have actively expressed opposition to the proposed tenancy of the Monterey Apartments.

In the ten years preceding June 30, 1980, the Monterey buildings were cited for multiple building code violations. A case was pending in the Circuit Court of Cook County against the former owner of the three-flat building for building code violations at the time the Monterey buildings were purchased by defendant Monterey Apartments in 1980. These code violations will be remedied as part of the rehabilitation.

The rehabilitation of the Monterey buildings involves: (1) the gutting and reconstruction of 808 West Junior Terrace according to a new floor plan in order to decrease the density in the building from 141 to 79 units; (2) the rebuilding of all mechanical, plumbing and electrical systems; (3) the installation of an electronic security system; (4) the installation of new appliances, air conditioning, cabinets, trim, and carpeting; (5) the preservation of the architectural character of the nine-story building; and (6) the preservation of limestone carvings, terra cotta, and marble hallway. There will be a recreation room and craft room for the residents in the rehabilitated nine-story building.

### Proposed Occupancy of the Rehabilitated Monterey Buildings

All of the tenants of the rehabilitated Monterey buildings will be entitled to receive rent subsidies under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f(a). Section 8 of the United States Housing Act of 1937 defines a lower-income family qualifying for rental assistance as one whose income does not exceed 80% of the median income in the metropolitan area as adjusted for the size of family. 42 U.S.C. § 1437f(f)(1). The proposed target level for the racial and ethnic integration of the rehabilitated Monterey buildings is: 41 white families, 17 black families, 12 Hispanic families, 7 Oriental families and 4 American Indian families. There is no way of predicting what the future racial occupancy of the Monterey Apartments will actually be.

### Characteristics of the Area Surrounding the Monterey Apartments

1. Housing Need in Uptown.

The City of Chicago, and in particular the Uptown Community Area, has a great need for housing. Low-income persons displaced by private investment in the Uptown area are in need of adequate housing. Governmental assistance in terms of subsidized housing is necessary in the Uptown Area with respect to meeting this need for housing. The Department of Housing and Urban Development does not have enough funds to meet the need for housing in the City of Chicago.

2. Location.

The property that is the subject of this lawsuit is located in the Uptown Community Area of the City of Chicago, one of 76 Chicago community areas designated for census purposes. The officially designated Uptown Community Area is the largest community area in the City of Chicago in terms of both population and number of housing units.

The Uptown Community Area is composed of census tracts 301–321. The community area itself is located on the North Side of the City of Chicago, along the shore of Lake Michigan. Its northernmost border is Devon Avenue (6400N) which is approxi-

mately one and one half miles south of the Chicago/Evanston border. Uptown's southernmost boundary is Irving Park Road (4000N) which is located approximately four miles north of the City's central business district. The western boundary of Uptown runs north along Clark Street from 1300 E. Irving Park Road to Montrose Avenue (4400N, 1500W), then west along Montrose Avenue to Ravenswood Avenue (1800W) and north again on Ravenswood to Devon.

### 3. The Relevant Community.

Plaintiff's expert, Elizabeth Warren, Ph.D., published a study in 1979 which divided the Uptown Community Area into the Uptown community in the south and the "Edgewater" community in the north because "attitudinal differences in that area suggest [that Uptown as defined for census purposes] is not a community unit. Even within the 15 Uptown census tracts [and excluding the six northern tracts in Edgewater] upon which this study is based, some people do not consider themselves part of Uptown." Warren, *Chicago's Uptown: Public Policy, Neighborhood Decay, and Citizen Action in an Urban Community*, p. 4, Plaintiffs' Exhibit 106. Dr. Warren's study then goes on to break down the 15 "Uptown" census tracts into six "traditional [neighborhoods] with names that go back many years. They are not necessarily representative of today's attitudes or internal sense of community. In some cases, indeed, there may be little sense of community, as in the Lake-Front [census] tracts where socio-economic differences are great. Uptowners still speak of these neighborhoods by name, however, so they are included here in groups of census tracts for ready identification." *Chicago's Uptown*, p. 15. Dr. Warren testified that census tract 321 in which the Monterey is located should not be considered in isolation. She was of the opinion that census tracts 321, 314, 315, 316, 320, 605, 606, 607 and 608 are relevant in attempting to group similar areas together.

The nine-story Monterey Apartment building at 808 West Junior Terrace is located on the 4300 block of North Clarendon Avenue at the corner of West Junior Terrace. North Clarendon Avenue between Irving Park Road (4000N) and Montrose (4400N) is characterized by large single family homes, mid-rise, and high-rise residential buildings of high quality, and non-residential uses, including two schools and a hospital.

Clarendon Avenue between Irving Park Road (4000N) and Montrose Avenue (4400N) forms the boundary between census tract 321 on the west and census tract 314 on the east. The Monterey Apartments are located in the northeast corner of census tract 321, directly across the street from tract 314. Census tract 314, which borders the Monterey Apartments, is a high income area. Tract 314 is a part of the neighborhood immediately surrounding the Monterey Apartments.

Brenneman School, the local public elementary school, lies in census tract 314, directly across the street from the Monterey Apartments. Brenneman School has a playground for children on the property. There is a second playground directly across the street from the Monterey on Clarendon, and a third on Clarendon, approximately three blocks south of the Monterey Apartments. Approximately one thousand feet east of the Monterey site, in census tract 314, is Lincoln Park, which contains playing fields, jogging and bicycle paths, and beaches.

The plaintiffs conduct their daily activities such as convenience shopping and recreation primarily within the area bounded by Montrose Avenue on the north, Irving Park Road on the south, Broadway to the west, and the Lake on the east. That portion of census tract 321 east of Broadway is generally known as the "Kenmore-Winthrop Corridor." This "corridor" stretches from Foster (5200N) to Irving Park Road along Kenmore and Winthrop Avenues.

The area immediately around the Monterey Apartments is an area where the private market place supports high rental values for apartments ranging from $400 per month and up. In recent years this area surrounding the Monterey has attracted

substantial private investment in new construction and rehabilitation of residential rental property, as well as the rehabilitation and condominium conversion of many older apartment structures.

In determining whether completion of the Monterey rehabilitation project will result in an undue concentration of minority residents or lead to a racially segregated housing area, the evidence adduced at the hearing supports a number of ways of defining the relevant area. The deposition testimony of Martin Hauselman, for example, indicates that the Association members themselves have been concerned in the past primarily with an area within two blocks of their Association boundaries. Other plaintiffs feel that their neighborhood is all of Uptown. The conflicting definitions of the "relevant neighborhood" offered by the individual plaintiffs and the plaintiffs' expert, Dr. Elizabeth Warren, for purposes of determining whether an "undue concentration" of assisted persons or minorities exists in the "area" surrounding the Monterey, were based on highly subjective judgments. In many instances the court was left with the firm conviction that boundaries of the relevant area were directly correlated to the witnesses' interest in having this court decide that relevant statistics would show a greater or lesser concentration of poor or minority residents. The point is that the determination of what a neighborhood is, for purposes of determining "undue concentration" of minority residents or assisted persons, is, itself, a highly subjective judgment. That fact necessarily affects this court's determination of whether or not HUD officials abused their discretion in determining that approval of the Monterey project would not result in an undue concentration of assisted persons or minority residents in the area surrounding the project.

This court is reluctant to substitute its judgment for the judgment of HUD officials in determining the "relevant area" that HUD must take into account when it makes a determination that a proposed section 8 housing site is located in an "area" that will avoid undue concentration of minorities or assisted persons. The court is aware of the fact that the district court in *King v. Harris*, 464 F.Supp. 827 (E.D.N.Y. 1979) did just that, in determining that HUD action similar to the action in this case was arbitrary and capricious. This court does not feel that it is bound to do so on the record made in this case. This court does not know what the record established in *King* but it is clear that the Second Circuit's decision of September 5, 1980, affirming the district court, relied on the fact that the evidence in that case justified the conclusion of the district court. The district court's opinion in *King*, strictly read, establishes only that it was arbitrary for HUD officials to consider only the racial and economic mix of the particular census tract in which the project was located. In this case, HUD officials did much more than that. HUD officials considered current available data on the amount of assisted housing available in census tract 321, census tracts contiguous with tract 321, and the Uptown Community Area as a whole. These officials also took into account that the site was located in the "General Public Housing Area" (GPHA) as defined by the injunction in *Gautreaux v. CHA*, 304 F.Supp. 736, 742 (N.D.Ill.1969). The GPHA is composed of all census tracts which are not located within one mile of a census tract with a non-white population greater than 30%. In addition, HUD's Area Office officials determined, on the basis of an analysis of market rental prices in the neighborhood, and on the basis of a favorable finding of a loan management specialist, that the area surrounding the Monterey Apartments was not an area containing a high proportion of low-income persons.

4. Concentration of Poor and Minority Residents in the Area.

In July of 1979 when HUD's preliminary processing of the Monterey proposal was taking place, the 1970 census figures were the most reliable available source for determining the ethnic, racial, and economic composition of the immediate neighborhood surrounding the Monterey.

Data relied upon by Dr. Warren during her testimony included 1978 estimates of

population and income level for the City of Chicago issued by the National Planning Data Corporation. There is no evidence as to how this data was compiled or of the reliability of the data.

The plaintiffs also introduced evidence of the racial composition of the Chicago Public Schools. There is no evidence that public school racial composition reflects the racial composition of the surrounding community. The plaintiffs also introduced HUD subsidized housing occupancy reports to show that some subsidized housing in the area surrounding the Monterey reflects an increasing percentage of minority occupancy. There is no evidence that HUD occupancy reports accurately reflect the racial composition of the Uptown community or of the neighborhood immediately surrounding the Monterey. Cf. King v. Harris, supra at 835; Lee v. Nyquist, 318 F.Supp. 710, 717 (W.D. N.Y.1970) (finding correlation between school and residential segregation).

According to 1970 census figures, census tract 314 had a median family income of $14,926 and a mean family income of $18,279. In 1970 in the City of Chicago the median family income was $10,242 and the mean family income was $11,418. Census tract 314 is not a low-income area.

According to 1970 census figures, census tract 321 had a median family income of $7,268 and a mean family income of $8,276. Census tract 321 east of Broadway is far more affluent than the western half, and its residents are economically and socially similar to residents of census tract 314. Census tract 321 east of Broadway is not a low-income area.

According to 1970 census figures, census tract 315 had a median family income of $6,985 and a mean family income of $7,583.

Table I sets out the percentages of total housing units which receive federal subsidies for the census tracts immediately surrounding the Monterey project.

TABLE I

| | Uptown | 321 | 314 | 315 | 316 | 320 | 606 | 607 | 608 |
|---|---|---|---|---|---|---|---|---|---|
| Total Housing Units as of 1970 (1970. Census) | 67,353 | 5,223 | 2,831 | 5,780 | 2,127 | 716 | 609 | 1,521 | 2,771 |
| Total Subsidized units as of July 1, 1979* | 6,287 | 849 | 18 | 1,734 | 321 | 1 | 11 | 285 | 12 |
| % of Subsidized units as % of 1970 Total Housing Units | 9.3 | 16.2 | .6 | 30 | 15.1 | .1 | 2 | 17.9 | 4 |

*Includes units approved by HUD but as yet unbuilt.
(Plaintiffs' Exhibit 104; Private Defendants' Exhibit 6; Warren Testimony, Tr. 695-696)

As of July 1, 1979, the combined percentage of assisted units in census tracts 314, 315, and 321 based on total 1970 housing units was 19%. The percentage of assisted housing units in tract 321 and all contiguous tracts was 16% as of July 1, 1979. According to Dr. Warren's figures, 12.4% of Uptown's housing was assisted housing on July 1, 1979.

Dr. Warren testified that the percentage of assisted housing in a census tract could be more accurately calculated by using City of Chicago estimates of households for 1978, rather than 1970 census figures for housing units. Dr. Warren did not know the definition of households used by the Census Bureau or whether individuals in nursing homes or rooming houses were included in

that definition. All of Dr. Warren's studies prior to her testimony in this court relied on housing unit data to calculate the percentage of assisted housing in an area. Although Dr. Warren testified that the 1970 census indicated a 13% vacancy rate for housing units, a Postal Vacancy Survey indicates that in October, 1980, Uptown had a 3% vacancy rate.

A study performed by Victoria Granacki and Deborah Stone, of the Metropolitan Housing and Planning Council, estimated the number of housing units in Chicago by community area as of May, 1980. The study based its estimates on the number of building permits issued for new construction and for demolition. Such permits are required by law for all new construction and demolition.

The Metropolitan Housing and Planning Council study concluded that the total number of housing units in the Uptown community area increased from 67,353 to 68,013 between 1970 and May, 1980. The study also concluded that the Uptown community area has a higher rate of construction and repair than the entire City of Chicago. Dr. Elizabeth Warren, in a 1979 study entitled *Subsidized Housing in Chicago*, concluded that the total number of housing units in Uptown had increased somewhat since 1970.

Using the housing unit figure estimated by the Metropolitan Housing and Planning Council study as a base figure for computing percentage of assisted housing units, the percentage of assisted units in Uptown in July, 1979 was 9.30%.

Adjusting the Metropolitan Housing and Planning Council Study figures to account for any discrepancy between permits issued and actual new construction and demolitions, the percentage of assisted housing units in Uptown in 1979 based on this adjusted figure would be 9.7%.

Nearly half of all of Uptown's subsidized housing is inhabited by elderly persons rather than low-income families. Moreover, a substantial amount of Uptown's subsidized housing is operated under the Section 236, Section 221(d)(3) and Section 8 programs which, unlike public housing, contain moderate as well as low-income families. The following table lists subsidized housing in Uptown by federal program and target group:

TABLE II.
UPTOWN COMMUNITY AREA

| | |
|---|---|
| Total Housing Units as of 1970 (1970 Census) | 67,353 |
| Total Subsidized Units (all programs) as of December 1, 1979 (as per Warren Study) | 6,832 |
| Elderly subsidized Housing Units | 2,651 |
|     Percentage of total Housing Units | 4.2% |
| Subsidized Housing Units under Section 8 family program | 1,021 |
|     Percentage of total Housing Units | 1.7% |
| Subsidized Housing Units Under Sections 221(d)(3) and 236 programs (family and elderly) | 3,082 |
|     Percentage of total Housing Units | 5.0% |
| CHA Public Housing Units for familes | 78 |
|     Percentage of total Housing Units | .1% |

| Total Non-elderly Subsidized Housing Units | 4,181 |
| Percentage of total Housing Units | 6.8% |

(Private Defendants' Exhibit 61;
Warren Testimony, Tr. 752-54)

In 1970, census tract 314 was 0.4% black, and census tract 321 was 4.2% black, according to official census figures. In the 1970 census, Hispanics were not reported as a discrete minority group. However, Spanish-speaking persons constituted 1.9% of the population of census tract 314 and 21.9% of census tract 321.

In 1970, Uptown, the community area composed of census tracts 307 through 321, was 3.4% black, and 12.5% Spanish-speaking.

In 1978, of those receiving some form of public assistance or "welfare" in census tract 321, 1,291 were whites, 482 were blacks, 399 were Hispanics, and 200 were of other minority groups. In census tract 314 in 1978, 239 of those receiving public assistance were white, 66 were black, 23 were Hispanic, and 9 were from other minority groups. (Private Defendants' Exhibit 51; Warren Testimony; Tr. 734–735). These figures indicate that the area the Monterey buildings are located in is an integrated area, and that those receiving public assistance or welfare are not predominantly of one ethnic or racial group.

There is no evidence that the additional 82 units of subsidized housing that will be provided by the Monterey buildings would create a minority, low-income ghetto in the area immediately surrounding the Monterey buildings.

There is no evidence that if the 82 units of the Monterey building go forward as proposed the neighborhood surrounding the Monterey buildings would have an undue concentration of assisted persons in an area containing a high proportion of low-income persons within the meaning of 24 C.F.R. § 881.206(c).

5. Revitalization of the Area Surrounding the Monterey Apartments.

There was no evidence presented showing that over the last ten years, the neighborhood surrounding the Monterey buildings has experienced an increase in crime, declining business activity, declining property values, or other indications of a deteriorating neighborhood. Plaintiffs submitted no evidence suggesting that crime is any worse in their immediate neighborhood or in the Uptown community area as a whole than it is in other comparable urban areas.

The undisputed evidence presented was that the neighborhood surrounding the Monterey buildings has been characterized by substantial private investment and increasing property values over the last ten years.

Over the last few years, the immediate neighborhood surrounding the Monterey buildings has been characterized by an urban phenomenon that has come to be known as "gentrification." Substantial numbers of upper middle class and middle class individuals have moved into the neighborhood, have rehabilitated existing housing stock and have encouraged new private investment. Major new construction includes the high-rise 450 unit Boardwalk Condominiums located directly across the street from the Monterey on Clarendon, the high-rise 252 unit residential and commercial development known as Pensacola Place, and the construction of Cuneo Hospital.

Many buildings on Clarendon Avenue and the streets surrounding the Monterey buildings have been rehabilitated. Much of this rehabilitation and construction is being accomplished with the aid of some form of federal subsidy whose primary beneficiaries will be middle class individuals.

William P. Thompson, a real estate developer whose house is directly across the street from the Monterey buildings, and who is a member of the plaintiff Association, has participated in and directly benefitted from this federally subsidized development.

The plaintiffs have expressed no objection to private and federally subsidized development and rehabilitation in their immediate neighborhood which is directed at middle and upper income individuals.

The plaintiffs expressed no objection to Section 8 rental subsidies in the William P. Thompson sponsored developments at Pensacola Place, Scotland Yard I and II or similar subsidies for 117 units in the Boardwalk Condominiums when such subsidies were recently sought by William P. Thompson.

As a result of the "gentrification" in the area of the Monterey buildings, and the attendant rising property values, racial and ethnic minority individuals of more modest means are in danger of being excluded from the immediately surrounding neighborhood.

Low-income persons displaced by private investment in the area are in great need of adequate housing.

*Course of HUD Approval of Mortgage Insurance Guarantees and Rental Subsidies for the Monterey Buildings*

In January of 1979, HUD issued a notification of fund availability for Section 8 family housing in the City of Chicago, known as NOFA–48.

When insufficient applications of adequate quality were submitted in response to that notification, HUD officials called a meeting of private developers in April of 1979 to discuss the nature of the financial and regulatory difficulties that had militated against a larger number of quality applications. Approximately 30 developers, including representatives of the private defendants, attended that meeting. Steven Hans, the Director of Housing for the Chicago Area, indicated at that meeting that high-rise proposals for Section 8 family housing would be considered if the proposals were appropriate. Thereafter, an additional notification of fund availability, NOFA–52, was issued.

As a result of that April 1979 meeting and a follow-up meeting held in May, a preliminary proposal for 82 units of family Section 8 housing was submitted to HUD by Ranbir Sahni on June 25, 1979.

HUD granted an initial endorsement for the proposed rehabilitation a full year later on May 14, 1980, after an extensive review and assessment of the proposal.

Initial endorsement committed HUD to provide Monterey Apartments with a mortgage insurance guarantee in the amount of approximately $3.8 million and rental assistance payments for each of the 82 dwelling units in the Monterey buildings reserved for lower-income families.

Without a guarantee of mortgage insurance and rental subsidies the rehabilitation of the Monterey buildings would not have been undertaken by private defendants.

In the interim of that one year HUD processed the application and made the following determinations:

(a) The proposal was consistent with the goals of the Chicago Housing Assistance Plan in effect at the time of the approval. The Chicago Housing Assistance Plan stated:

"*Rehabilitation: Census Tract Numbers.* Priority is also to be given to Section 8 housing development in the following Priority Urban Renewal Areas: Haskings-Hermitage; Uptown Conservation Area . . ." (Private Defendants' Exhibit 58, Table IV).

That plan proposed that 1,305 units of Section 8 rehabilitated housing be provided in Chicago. Of the total number of Section 8 units of rehabilitated housing available only 225 were designated for Area I which encompasses census tract 321, and that part of the "Gautreaux General Order" which is in the northern half of Chicago.

(b) The Monterey buildings complied with site and neighborhood standards established by HUD regulations, including the requirement that the housing would not create an undue concentration of assisted or minority persons in the vicinity of the Monterey buildings.

(c) On the basis of analysis of rental prices and market values in the neighborhood, and on the basis of positive findings of a loan management specialist, the area of

the Monterey buildings was not a low-income area.

(d) The Monterey buildings were not located in an area of minority concentration; approval of the proposal would therefore provide a greater choice of housing for minorities.

(e) There was no practical alternative to approval of the nine-story Monterey building for family housing even though the building is an elevator building. HUD explicitly found that alternative proposals for Section 8 funding for low-income families were substantially less suitable in design and location for family life.

(f) The Monterey buildings conformed to all "applicable state and local laws, codes, ordinances and regulations," as required by 42 C.F.R. § 881.207(f) (1980), on the basis of building permits issued by the Department of Inspectional Services of the City of Chicago, and based on an opinion letter written by Mr. Howard Richard of the law firm of Katten, Muchin, Gitles, Zavis, Pearl & Galler.

HUD sought the advice of the Northeastern Illinois Planning Commission (NIPC) on the desirability of the Monterey proposal. NIPC recommended that the proposal be approved.

The Chicago Area Office of HUD compared the Monterey proposal with all other proposals for low-income family housing submitted under NOFA–52. HUD compared the projects on the basis of many factors, including proximity to necessary services and facilities, effect on concentration of low-income and assisted persons, physical design and other features, previous experience with the developer, consistency with local governmental goals, financing and feasibility.

The office determined that the Monterey buildings ranked seventh of the 28 proposals submitted in response to the NOFA and that approval of the proposal would therefore be appropriate.

HUD's decision to approve the Monterey proposal was based on a balanced consideration of all appropriate factors. There is no evidence that HUD committed any error, let alone a clear error, at any stage of its decision making process or that it abused its discretion in approving the proposal for a mortgage guarantee and Section 8 rental subsidies for families in the Monterey buildings.

*The Alleged Violation of the Lakefront Protection Ordinance*

West Junior Terrace between Clarendon and Hazel Streets forms a boundary of the Lakefront Protection District as defined by the Lake Michigan and Chicago Lakefront Protection Ordinance. The Monterey Apartments are located within the district. The properties directly across the street, on the south side of Junior Terrace, however, are not within the district.

At all times relevant to this lawsuit, individuals employed by the Chicago Building Department (now renamed the Department of Inspectional Services) charged with the review of building permit applications for conformity to applicable zoning requirements were instructed by the City's Zoning Administrator, Harry Manley, to forward all building permit applications for buildings within the Lakefront Protection District to the Department of Planning for review. Upon receiving these applications, it was the custom of the Department of Planning to determine whether the rehabilitation was exempt from the requirements of the Lakefront Protection Ordinance.

J. J. Fitzpatrick, an employee of the Building Department, inadvertently failed to forward the building permit applications for the Monterey buildings to the Department of Planning. There is no evidence that the developer defendants were responsible for or aware of this oversight.

On or after September 18, 1980, two months after the rehabilitation of the Monterey buildings had commenced, this oversight was brought to the attention of Mr. Manley. In a letter dated September 24, 1980, Manley informed Martin Murphy, Commissioner of the Department of Planning, of the oversight and referred the building permit application to him for review.

Having been apprised of the issuance of the building permits the Department of Planning has not made any determination with regard to whether the proposed rehabilitation is covered by the Lakefront Protection Ordinance and the Chicago Plan Commission, to date, has not approved the project. Rehabilitation of the Monterey is entirely internal. It will neither increase the site coverage nor the height of the nine-story structure.

The contract between defendant G. Bliudzius Contractors, Inc. and Monterey Apartments provides that Bliudzius will be paid $2,163,216 for the rehabilitation of both Monterey buildings. This contract does not separately state the cost attributed to each building. The contract costs include all costs of construction, including demolition, installation of appliances and carpeting, as well as landscaping.

A HUD Form 2328 which is attached to the FHA form "Construction Contract—Cost plus," indicates that the hard costs of the rehabilitation of the Monterey nine-story structure were estimated to be $1,859,569.

Eugene Holland, plaintiffs' expert witness on replacement costs, estimated the cost of constructing buildings on the Monterey property of the same size as the two buildings presently there, and designed to serve the same functions as the buildings before rehabilitation. His estimates were based in part on an evaluation of the costs of nine other buildings, in different areas of the country. Holland testified that the substitute nine-story building contemplated in his estimates would not include amenities considered standard in new residential buildings, such as air conditioning and two passenger elevators. The substitute building proposed by Holland would not have the aesthetic amenities present in the existing nine-story structure, such as limestone carvings, terra cotta, and marble flooring in the main entry. Holland estimated that construction of the substitute nine-story building would cost $3,963,588. He further estimated that the cost of the substitute three-flat would be $319,078. Therefore, Holland's estimate for the total cost of the two substitute buildings was $4,282,666. That amount is more than double the actual maximum rehabilitation costs of both Monterey Apartment buildings. In other words, the costs of repair and rehabilitation for the two buildings do not exceed 50% of the plaintiffs' expert's estimate of the replacement costs of the existing structure.

The plaintiffs introduced evidence of what a reasonable profit for a contractor would be on a project such as this. The generally accepted market rate profit for a builder is somewhere around eight percent of hard construction costs. However, there is no evidence from which this court can determine what if any profit the contractor defendant will actually receive. The defendant contractor was permitted to purchase a limited partnership share in Monterey Apartments for $100. These shares are being offered to investors for $10,000. On the basis of the evidence offered at the hearing the only evidence of actual cost to the partnership of rehabilitating the Monterey Apartments' nine-story structure was the $1,859,569 figure for hard construction costs.

James Loewenberg, an architect, who testified as the private defendants' expert witness, estimated that the replacement cost of replacing the nine-story Monterey structure with one of comparable size and function using contemporary construction techniques would exceed $4,250,000. Loewenberg's estimate was based on a comparison of three buildings recently constructed in Chicago, plus consideration of the added cost of plaster partitions, limestone, and marble. Loewenberg estimated that the cost of plaster partitions, limestone and marble alone would increase the costs of construction considerably. He also estimated that the use of marble and limestone would add considerably to the costs of a conventional building.

Jerome Jacobson, Deputy Commissioner of the Department of Planning, stated that, in interpreting the "cost of replacing the existing structure," his department considers the cost of building a new structure

identical in all respects to the existing structure.

By any reasonable measure and based on the evidence adduced at the hearing, the cost of replacing both the existing buildings is more than twice the actual cost of rehabilitation.

The rehabilitation of the Monterey nine-story building will result in a decrease in total unit density from 141 to 79 units. There is no evidence that the rehabilitation project will result in an increase in street traffic or sidewalk traffic, or present a burden on available parking greater than the burden posed by the occupants of the Monterey in the past. There is no evidence that plaintiffs will be adversely affected by any aspect of the rehabilitation project.

### Injury to Plaintiffs

There was no credible evidence presented during the hearing on the preliminary injunction that the plaintiffs have suffered or will suffer any injury as a result of the physical rehabilitation of the Monterey Apartments or by the provision of HUD mortgage insurance and housing assistance payments to the defendant owners and developers. Plaintiffs offered the testimony of a number of witnesses on this subject, but their testimony amounts to the recital of their own speculations about the kinds of tenants who are likely to lease apartments at the Monterey. These witnesses offered speculations as to the likelihood that the low-income families that will occupy the Monterey will be composed of criminals and other undesirables, and that their neighborhood will be inundated with residents who are members of racial or ethnic minorities. This court sees no credible indications that the Monterey rehabilitation project will have any adverse effect on the community in which plaintiffs reside, i. e. the court does not believe that the rehabilitation of the Monterey Apartments and its occupancy by 82 low-income families is likely to cause the neighborhood surrounding the project (however defined) to become a minority or low-income ghetto. Given the stably integrated character of Uptown at present, the court does not believe that the plaintiffs are in danger of losing the social benefits of living in an economically and racially integrated neighborhood. Given the present strong revitalization of the Uptown community, it is also unlikely that completion of the Monterey rehabilitation project will adversely affect property values or the "environmental, recreational, cultural, historical, and aesthetic qualities" of the neighborhood.

### Conclusions of Law and Discussion

1. *Jurisdiction and Standing: The Federal Claims*

The court has jurisdiction over the federal claims contained in Counts I and II of the complaint pursuant to 28 U.S.C. § 1331.

■ An actual "case or controversy" exists within the meaning of Article III of the Constitution in that the complaint and motion allege that the plaintiffs themselves will suffer injury as a result of the federal defendants "arbitrary and capricious" approval of the Monterey Apartments proposal. *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). If this court does not grant the relief sought, the plaintiffs' claim that increased concentration of low-income and minority residents will result in the creation of a segregated neighborhood. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 114, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979); *Shannon v. HUD*, 436 F.2d 809, 818 (3d Cir. 1970).

■ The causal connection between each of the alleged arbitrary actions of the federal defendants and the threatened harms to the individual plaintiffs' economic and social interests are "fairly traceable" to HUD's actions. *See Duke Power Co. v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260–261, 97 S.Ct. 555, 560–61, 50 L.Ed.2d 450 (1977); *United States v. SCRAP*, 412 U.S. 669, 686–688, 93 S.Ct. 2405, 2415–2416, 37 L.Ed.2d 254 (1973).

■ Prudential considerations of standing require the court to consider, in addition, "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150 at 153, 90 S.Ct. 827 at 830, 25 L.Ed.2d 184 (1970). This court believes that the statutory requirements upon which the plaintiffs rely arguably bring them within the zone of interests protected by them. 12 U.S.C. § 1715*l*(d)(2); 42 U.S.C. § 1437f(c)(1) and 42 U.S.C. § 3608(d)(5).

■ Finally, there is no indication that Congress intended to preclude review of HUD decisions relating to approval of Section 8 housing proposals. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Thus Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, allows the plaintiffs to seek review of HUD's approval of the Monterey Apartments proposal. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

### 2. *The State Law Claim*

The Lake Michigan and Chicago Lakefront Protection Ordinance, Chicago, Ill. Municipal Code ch. 194B provides that:

It shall be unlawful for any physical change, whether temporary or permanent, public or private, to be undertaken . . . within the Lake Michigan and Chicago Lakefront Protection District . . . without first having secured the approval therefore from the Chicago Plan Commission as provided in Article VI of this chapter; *provided*, however, that the following shall be exempt from the prohibition aforestated: *repairs and rehabilitation which do not exceed fifty (50) percent of the total cost of replacement of the existing structure; additions which do not increase the site coverage or the height of the structure, and residential structures containing not more than three dwelling units.* (emphasis added)

In Count III the plaintiffs' attempt to state a claim for relief premised upon Ill. Rev.Stat. ch. 24 § 11–13–15. That statute provides in pertinent part that:

In case any building . . . is constructed . . . or used in violation *of an ordinance or ordinances adopted under Division 13, 31 or 31.1 of the Illinois Municipal Code*, or of any other ordinance or other regulation made under the authority conferred thereby . . . any owner of real property within 1200 feet . . . of the property on which the building in question is located . . . may institute any appropriate action . . .

(1) to prevent the unlawful construction . . . or use

\*   \*   \*   \*   \*   \*

In any action . . . for a purpose mentioned in this section, the court with jurisdiction . . . has the power [to] issue a restraining order . . . (emphasis added).

The alleged violation of the Lakefront Protection Ordinance by the private defendants was the undertaking of rehabilitation work at the Monterey site. Subparagraph 194B–5.1 of that Ordinance prohibits, *inter alia*, any non-exempt physical change or construction within the Lakefront Protection District without the approval of the Chicago Plan Commission. The Lakefront Protection Ordinance was adopted by the City Council of Chicago on October 24, 1973. However, Section 1 of the Ordinance states:

Pursuant to the provisions of the Constitution of the State of Illinois of 1970, the Municipal Code of Chicago is hereby amended by adding a new chapter thereto, to be numbered 194B and known as the Lake Michigan and Chicago Lakefront Protection Ordinance.

■ This ordinance is not an ordinance "adopted under Division 13, 31 or 31.1 of the Illinois Municipal Code, or other regulation made under the authority conferred thereby." Division 13 of the Illinois Municipal Code grants "the corporate authorities in each municipality" the power to pass ordinances regulating land uses. Ill.Rev. Stat. ch. 24 § 11–13–1. The grant of au-

thority contained in § 11–13–1 of the Municipal Code expressly provides, however, that it "does not apply to any municipality which is a home rule unit." Since the City of Chicago is a home-rule unit as defined by Article VII § 6 of the Illinois Constitution of 1970, it is apparent that a violation of the Lakefront Protection Ordinance cannot serve as the predicate for a suit based on Ill.Rev.Stat. ch. 24 § 11–13–15. The defendants' motion to dismiss Count III, for failure to state a claim upon which relief can be granted under Illinois law, is granted.

### 3. The Standard for Granting a Preliminary Injunction

On a motion for a preliminary injunction the plaintiff has the burden of proving: (1) that there is a reasonable likelihood of prevailing on the merits; (2) that there is no adequate remedy at law and that irreparable harm will follow from the failure to issue the injunction; (3) that the threatened irreparable injury outweighs the harm an injunction will inflict on the defendant; (4) that the granting of a preliminary injunction will not disserve the public interest. *American Dairy Queen v. Brown Port Co.*, 621 F.2d 255, 257 (7th Cir. 1980); *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1261 (7th Cir. 1980); *Ekanem v. Health & Hospital Corp. of Marion Cty*, 589 F.2d 316, 319 (7th Cir. 1978); *Fox Valley Harvestore, Inc. v. A. O. Smith Harvestore Products, Inc.*, 545 F.2d 1096 (7th Cir. 1976).

#### A. Likelihood of Success on the Merits

In determining whether the plaintiffs have established a "reasonable likelihood of success on the merits" against the federal defendants, the first issue to be addressed is the scope and standard of review of the actions of the HUD officials responsible for processing the Monterey Apartments' application for mortgage insurance and Section 8 housing assistance payments.

The federal defendants' actions in this case are subject to review pursuant to Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which states in pertinent part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall

\*    \*    \*    \*    \*    \*

(2) hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ....

As did the Supreme Court in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), this court finds no statute or regulation that requires HUD to process Section 8 applications or Section 221(d)(4) mortgage insurance applications in accordance with the rulemaking or adjudicatory procedures set forth in Sections 553, 556, or 557 of the Administrative Procedure Act, *see* 24 C.F.R. Parts 881, 891 (1980). Furthermore, HUD processing of the Monterey Apartments proposal was not adjudicatory in nature. Therefore, as in *Overton Park*, Section 706(2)(A) provides the proper standard of review.

The Supreme Court made it clear in *Overton Park* that review of agency action, where formal findings were not required, should be

based on the full administrative record ... but since the bare record may not disclose the factors that were considered or the [Secretary's] construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard.

The court may require the administrative officials who participated in the decision to give testimony explaining their action. Of course, such inquiry into the mental processes of administrative decisionmakers is usually to be avoided. *United States v. Morgan*, 313 U.S. 409,

422, [61 S.Ct. 999, 1004, 85 L.Ed. 1429] (1941). And where there are administrative findings that were made at the same time as the decision, as was the case in *Morgan*, there must be a strong showing of bad faith or improper behavior before such inquiry may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves . . .

*Id.* 401 U.S. at 420, 91 S.Ct. at 825.

■ The above-quoted language guided this court in its conduct of the evidentiary hearing in this case and it also guides this court in determining what evidence is relevant to the question of whether Chicago Area HUD officials abused their discretion in approving the Monterey Apartments rehabilitation project for federal assistance. In making that determination, the court

must consider whether the decision was based on a consideration of the relevant factors and whether there has been *a clear error of judgment* (citations omitted). Although this inquiry into the facts is to be searching and careful, *the ultimate standard of review is a narrow one. The court is not to substitute its judgment for that of the agency.* (emphasis added).

*Id.* at 416, 91 S.Ct. at 823.

In *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Court made it clear that the "inquiry into the facts"

to be made by the District Court was to be primarily focused on "the administrative record already in existence," and not some new record made initially in the reviewing court . . . If there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but, as contemplated in *Overton Park*, to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decisions as may prove necessary.

*Id.* 411 U.S. at 142–143, 93 S.Ct. at 1244.

In *City Federal Sav. & Loan Assn. v. Federal Home Loan Bank*, 600 F.2d 681, 688 (7th Cir. 1979), the court stated:

The reviewing court should set aside agency action of the FHLBB only if it is arbitrary, capricious, an abuse of discretion or not in accordance with the law.

\* \* \* \* \* \*

Section 706(2)(A) embodies a doctrine of judicial restraint. The choice between lawful courses of action is entrusted to the agency, not the courts. *SEC v. Chenery*, 318 U.S. 80, 94 [63 S.Ct. 454, 462, 87 L.Ed. 626] (1943); K. Davis, Ad Law Text § 4.02 at 81 (3d ed. 1972).

In this light, the court views the testimony of plaintiffs' expert witness as mainly relevant to plaintiffs' contention that they will suffer irreparable injury if the injunction does not issue. With respect to the issue of whether plaintiffs have shown that HUD officials abused their discretion, the court focuses primarily on the testimony of the relevant decisionmakers.

### HUD Processing of the Monterey Apartments Proposal

. The plaintiffs have pressed four areas of HUD decisionmaking which they feel call for "holding unlawful and setting aside" HUD's actions as "arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law." These four areas of alleged arbitrary action are (1) HUD's determination that approval of the Monterey proposal would not lead to "undue concentration of assisted persons in areas containing a high proportion of low-income persons." 24 C.F.R. § 881.206(b) (1980); (2) HUD's determination that approval would not result in an undue concentration of minority residents in the area or lead to a racially segregated neighborhood, *see King v. Harris*, 464 F.Supp. 827 (E.D.N.Y.1979), *aff'd sub nom, King v. Faymor Development Co.*, 614 F.2d 1288 (2d Cir. 1979), vacated 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256 (1980), *aff'd and injunction modified*, 636 F.2d 1202 (2d Cir. 1980); (3) HUD's determination that there was "no practical alternative" to putting families

with children in the Monterey Apartments' nine-story structure, 42 U.S.C. § 1437f(c)(1), 24 C.F.R. § 881.202(d); (4) HUD's determination that the rehabilitation complied with all "State laws, or local ordinances or regulations, relating to the public health or safety, zoning, or otherwise." 12 U.S.C. § 1715*l* (d)(2).

The Section 8 program was developed by Congress

> for the purpose of aiding lower-income families in obtaining a decent place to live and of promoting *economically mixed* housing. (emphasis added)

42 U.S.C. § 1437f(a).

In conformity with this purpose, the Secretary has promulgated a regulation, applicable to the Section 8 substantial rehabilitation program, that requires that:

> Proposed sites for substantial rehabilitation project must be approved by HUD as meeting the following standards:
> (b) The site must promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons.

24 C.F.R. § 881.206(c).[1]

In determining whether federal assistance for the proposed rehabilitation of the Monterey Apartments was consistent with this regulation, Preston Caplan, the Chicago Area Office's Director of the Economics and Market Analysis Division (EMAD) used assisted housing units as a substitute for assisted persons. He determined the number of assisted housing units from current Area Office records he is responsible for maintaining and updating. Mr. Caplan included in his count of assisted units not only Section 8 units, but public housing units and units assisted under Sections 221(d)(3) and 236 of the National Housing Act. 12 U.S.C. §§ 1715*l*(d)(3), 1715z–1. His count of assisted housing units included those occupied by both the elderly and families. He then divided the current total of assisted housing units by the total number of housing units as of the 1970 census.

Caplan testified that although he would begin to look closely at the percentage of assisted housing units as it approached 25% of all the units in an area, this percentage was flexible. Since Caplan only had the Area's existing housing unit figures for 1970, by census tract, he considered three relevant areas in determining undue concentration. (1) Census Tract 321; (2) Census Tract 321 and immediately surrounding tracts, and (3) the Uptown Community Area as a whole.

According to Caplan's calculations, the percentage of assisted housing units in Census Tract 321 as of July 1, 1979 was approximately 15%, while the concentration in the Uptown Community Area was 10%–11%. *See also* Table I.

■ This court sees no basis whatsoever for holding that Caplan's method of estimating the concentration of assisted persons in Uptown by using current assisted housing units as a substitute for assisted persons was an abuse of discretion. Furthermore, while only 1970 census housing unit figures were available, Caplan's use of 1970 census figures most likely underestimated actual housing units available in 1979 since he did not include any new construction in this figure. There was substantial evidence of new investment and construction in the 1970's and although certainly many housing units in Uptown were destroyed in the decade, the court feels that the evidence indicates that Caplan's method probably indicated a higher percentage of assisted units than actually existed. Thus, Caplan did not only consider Census Tract 321 but two other potentially relevant areas and his certification that the Monterey project was proposed for a site that met the strictures of HUD regulations in terms of

---

1. Prior to January 31, 1980 this regulation was located at 25 C.F.R. § 881.112(c). The language of the regulation was apparently derived from the language of 42 U.S.C. § 5304(a)(4)(C)(ii). Chapter 53 of Title 42 U.S.C. is not otherwise relevant to the issues raised in this suit, since it does not apply to private developers but rather to HUD's duties with regard to making grants available to governmental units for community development programs. *See Aertsen v. Landrieu*, 637 F.2d 12 at 21–22 (1st Cir. 1980).

concentration of assisted persons cannot remotely be said to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Moreover, no clear error of judgment was made by Caplan in making this determination. Plaintiffs' Exhibits 71 and 104 contain HUD assisted housing unit data as of September 30, 1980. Page 104 of Exhibit 71 indicates that the total elderly and family assisted housing units in tract 321 was 876 units. Given the 1970 census figure for total housing units in tract 321 of 5223, the percentage of assisted units did not exceed 20%. If one calculates the assisted housing percentage from 1980 HUD figures and 1970 census figures for tract 321 and its surrounding Uptown tracts, i. e. 314, 315, 316, 320, the total of all assisted housing in that area is 3260 units. As of 1970 there were 16,677 total housing units in that area. The percentage of assisted housing in this area would be approximately 21%. Again, this percentage figure does not indicate that there is an undue concentration of assisted persons in this area. Finally, if one includes Census Tracts 606, 607 and 608, which are located along the southern border of tract 321, the relevant figures indicate an even smaller percentage of assisted persons.

The testimony of HUD officials indicates that HUD considered this factor in approving the Monterey Apartments proposal and committed no clear error in considering the site's suitability in relationship to the concentration of assisted persons.

The plaintiffs' second attack on the Area Office's approval of the Monterey project is based on a HUD regulation now located at 24 C.F.R. § 881.206(b) (1980). (Prior to January 31, 1980, this regulation was at 24 C.F.R. § 881.112(b) (1979). This regulation states that

The site and neighborhood shall be suitable from the standpoint of facilitating and furthering full compliance with the applicable provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, Executive Order 11063, and HUD regulations issued pursuant thereto.

Sam Riley is the Director of the Fair Housing and Equal Opportunity Division (FH & EO) of the Chicago Area Office and is responsible for ensuring that Area Office activities are consistent with duties imposed on HUD by Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, and Executive Order 11063. 24 C.F.R. § 881.206(b). See also 24 C.F.R. § 108 et seq., § 200.600 et seq. (1980). Mr. Riley was assisted in these duties by Ms. Skurlock, an Equal Opportunity Specialist, employed in the Chicago Area Office for eight years.

Riley was directly responsible for reviewing the Monterey preliminary proposal with regard to the suitability of its location under 24 C.F.R. § 881.206(b). In approving the preliminary proposal for Monterey, Mr. Riley considered the fact that the site was located in the general public housing area of the City of Chicago as defined in the Gautreaux injunction, and that the project would promote greater choice of housing opportunities, while avoiding undue concentration of minority residents. In making this determination, Riley or his staff relied on 1970 census data for all the census tracts in the community area of Uptown and in tracts outside of Uptown, but in close proximity to the Monterey. Riley did not know of any other information available to him which would contain accurate demographic data.

As an EO specialist, Ms. Skurlock is responsible for ensuring compliance with the Fair Housing Act and other equal opportunity laws by the Area Office and clientele. Ms. Skurlock was in fact responsible for doing the equal opportunity review for the Monterey Apartments preliminary proposal. Included in the preliminary proposal is a statement by the sponsor of the project concerning the racial composition of the neighborhood. Ms. Skurlock did not do any independent checking of the developer's figures. Those figures reflect a racial mixture of the "neighborhood" (undefined) consisting of 57% white, 18% black, 23% Spanish-American, and 2% other.

Ms. Skurlock also reviewed an "affirmative fair housing marketing plan (AFHMP) submitted by the developer. Plaintiffs' Exhibit 35. That plan, which is submitted by every project sponsor, is used by HUD to ensure that the project developer will make reasonable efforts to market the rental units in a non-discriminatory manner and to "assure that any groups of persons *not likely to apply* for the housing without special outreach efforts ... know about the housing, feel welcome to apply and have the opportunity to buy or rent." Plaintiffs' Exhibit 35; *See* 24 C.F.R. § 200.610 (1980).

The Monterey plan submitted on September 25, 1979 indicates that the developer's rental agent would advertise the availability of rental units in media calculated to reach a broad spectrum of the Chicago area population. It called for advertisements in both major Chicago newspapers, as well as the Daily Defender and La Raza. It also called for contacts with Operation Push, the Chicago Commission on Human Relations and the Leadership Council of Metropolitan Open Communities. The plan anticipated that 46 apartments would be occupied by whites, 21 by black and 9 by Spanish-American tenants.

Ms. Skurlock contacted Mr. Michael Wiley, an agent of the defendant sponsor, Ranbir Sahni, to inquire about the anticipated occupancy results listed on the plan. Ms. Skurlock indicated that the anticipated occupancy results did not account for all of the proposed apartments and that the plan should anticipate American Indian and Oriental tenants since the developer had indicated on the plan that both groups would be targeted in the outreach efforts to be made. Mr. Wiley responded by letter, dated October 24, 1975, that the developer felt that anticipated occupancy results would be more accurately reflected by 41 white, 17 black, 12 Spanish-American, 4 American Indian, and 7 Oriental occupied apartments. Ms. Skurlock made no independent determination of the likelihood that the actual results would approximate the developer's anticipated results.

Ms. Skurlock did not visit, nor was there any evidence that she was required to visit, the neighborhood of the Monterey to determine the racial/ethnic makeup of the area. She did, however, check 1970 census figures to determine the racial makeup of the area. She was not aware of any other reasonably available data which would provide a more accurate estimate of the racial/ethnic makeup in the neighborhood of the Monterey.

Ms. Skurlock also participated at the preliminary proposal stage in determining whether the location of the Monterey proposal was appropriate in light of the site and neighborhood selection standards of 24 C.F.R. 881.206(b). In assisting the Fair Housing officer of the Chicago Area Office, Ms. Skurlock reviewed 1970 census tract data to determine that the area was not one of minority concentration and that the proposal would offer a greater housing choice to minorities. She did not review Chicago Public School racial head-count data, nor did she review annual racial occupancy reports maintained by HUD to assess the quality of the developer's program to reach the anticipated occupancy goals of its affirmative fair housing marketing plans. In Ms. Skurlock's judgment only the census provided data that could be uniformly applied to all areas.

She testified that had she been aware of the availability of public school head-count figures, she would not have used these figures to determine racial concentration in an area, because they obviously would not reflect the racial mix of private or parochial school enrollment. (In fact, only one member of the plaintiff association has a child attending a Chicago Public School.) Moreover, Ms. Skurlock's judgment was that the racial occupancy reports on subsidized housing in an area could not be used to judge the racial composition of an area's population. The court agrees. In fact, in light of efforts required to be made by developers to reach minorities and those who would otherwise not apply, it is reasonable to assume that the racial composition of a particular project is atypical of the neighborhood in which it is located.

█ It is apparent that the affirmative housing marketing plans and HUD's monitoring of them does not seek to guarantee that housing projects are integrated or that particular quotas are met. Rather, they are intended to provide means by which HUD can monitor a project owner's efforts to reach racial and ethnic groups that would not otherwise be expected to seek housing in that project "because of existing neighborhood racial or ethnic patterns, price, and/or other factors." Plaintiffs' Exhibit 35, Item 4. See 42 U.S.C. § 3604.

Ms. Skurlock's testimony also established that the Monterey Apartments are located in the "general public housing area" (GPHA) as defined in the *Gautreaux* injunction. That injunction establishes a presumption that the GPHA includes all census tracts in the City of Chicago which have a minority population of less than 30% as shown by 1970 census data, until 1980 census data becomes available. The fact that the Monterey was located in the GPHA was considered by Ms. Skurlock as evidence that approval of the project would not result in minority concentration.

In determining whether the Affirmative Fair Housing Marketing Plan submitted by the developer of Monterey contained a reasonable anticipated occupancy goal, Mr. Riley's testimony indicates that his staff would have relied on 1970 census data for the city as a whole. This does not appear unreasonable in view of the city-wide media to be employed in the developer's outreach efforts. As has already been stated, the purpose of the AFHMP is not to guarantee racial quotas or racially integrated projects, it is to ensure that all racial groups in a marketing area have knowledge of and an opportunity to rent units in a particular building.

█ Considering the evidence adduced at the hearing, this court believes that Ms. Skurlock and Mr. Riley considered the relevant factors in determining that the Monterey Apartment site complied with the requirements of 24 C.F.R. § 881.206(b) and did not commit a clear error of judgment. It is clear from the evidence that the neighborhood surrounding the Monterey Apartments

whether defined as the immediate area of the Association, an area within two blocks of the Associations boundaries, Census Tract 321 alone or Census Tract 321 and contiguous tracts, has become a stable integrated area, characterized by a very significant amount of private investment in new and rehabilitated rental housing and condominiums. Moreover, the court sees no danger of this neighborhood or Uptown as a whole becoming a segregated community either in terms of socio-economic or racial characteristics.

The plaintiffs' third line of attack on HUD's decision to assist the Monterey Apartments rehabilitation project centers on the Area Office's determination that there was "no practical alternative" to approval of the Monterey Apartments, notwithstanding that the project anticipates family occupancy of this nine-story elevator structure. See 42 U.S.C. § 1437f(c)(1); 24 C.F.R. § 881.202(d) (1980).

Mr. Michael Barnas is presently employed in the Chicago Area Office of HUD as a housing programs representative. His present responsibilities include coordinating the processing of Section 8 assisted housing projects from the time a developer submits a preliminary proposal to the Area Office until completion of the construction or rehabilitation of the housing and occupancy thereof.

From January 1, 1978 until September 30, 1979, Barnas was primarily responsible for coordinating the processing of preliminary proposals that the Chicago Area Office received in response to Notices of Fund Availability (NOFA). NOFA's are used to announce that funds are available for Section 8 housing projects and to solicit proposals for units in the field office jurisdiction. These notices identify what the Area Office believes to be the housing needs for that area and request project proposals from qualified developers. 24 C.F.R. § 881.201 (1980).

Two NOFA's relevant to this case were admitted in evidence. NOFA 48 was issued in January, 1979 and announced that HUD expected $3,386,647 to be available under

the Section 8 program for rent subsidies on new construction, and $5,061,526 to be available for subsidies on rehabilitated housing. The NOFA called for 529 units of new construction and 885 units of substantially rehabilitated housing for families. Plaintiffs' Exhibit 89.

Barnas testified that HUD received about 20 proposals in response to NOFA 48 which if funded could have provided approximately the number of housing units called for by NOFA 48. After reviewing the proposals submitted in response to NOFA 48, the officials at the Chicago Area Office determined that the quality of these proposals did not justify spending the allocated sums. Therefore, the Chicago Area Office published NOFA 52, which superseded NOFA 48, and sought proposals for 1360 units of elderly and family housing. NOFA 52 required that at least half of the proposed units in a project be for family as opposed to elderly occupancy. NOFA 52 expressed preferences for projects containing 100–200 units of housing, and for projects that would have at least 20% large family units (3 bedroom apartments). NOFA 52 also preferred projects whose family units would be located in the general public housing area, as defined by the injunction entered in *Gautreaux*. HUD received proposals for more housing units than it could fund under NOFA 52.

Barnas was personally responsible for reviewing the preliminary proposal for Monterey Apartments submitted in response to NOFA 52. Included in a review of a preliminary proposal calling for family units to be located in a high-rise elevator building, was a case by case analysis of whether there was a practical alternative to funding the particular high-rise proposal. *See* 42 U.S.C. § 1437f(c)(1). In response to NOFA 52 approximately 2400 units were proposed, 800 of which were high-rise units. It is unclear how many of these were intended for occupancy by the elderly or where the non-Uptown high-rise proposals were located.

Barnas testified that the basic criterion for determining that there was "no practical alternative" to a particular high-rise

proposal was "whether after the projects had been ranked and they had been compared to all the other projects in the office, on a large number of criteria, whether on balance this was a desirable project and whether it was, in fact, superior to most of the other projects we had in the office... In making a finding of desirability of the project, the fact that this did involve elevator structures for families counted against it, but it was not used as a sole and determinative criterion, as might be the case in some other defect which we felt was more serious in a proposal." Transcript of hearing at p. 56.

With regard to the Monterey Apartments, Barnas testified that:

> When the rankings had been completed and we had the rank order of the projects, it was clear that this was in a range of scores where we believed that we wanted to approve this project, and I examined the files for justification of that and the memo which I composed for the file basically enumerates the reasons why we felt this was a desirable project despite the fact that it used an elevator structure. Transcript, p. 56.

Mr. Barnas drafted a memo for the file on Monterey on August 31, 1979 which determined that there was "no practical alternative" to approval of the Monterey Apartment high-rise elevator structure. Plaintiffs' Exhibit 60. The memo dated August 30, 1979 was directed to defendant Elmer Binford, Chicago Area Office Manager. That memo which was approved and signed by Mr. Hans stated:

> The subject proposal calls for 81 small family units in 2 buildings at Junior Terrace and Clarendon in the southeastern part of the Uptown community area. One building is a three story walk-up. The other is a 9 story elevator building. The buildings are currently vacant, so no displacement will occur. The number of units will be decreased from 143 to 81, with a corresponding increase in area per unit. The site faces a playground on the east side of Clarendon and Lincoln Park is only one block away. There is little or

no subsidized housing in the immediate area and the area is undergoing considerable private restoration. Given the desirability of this neighborhood, there would seem to be no alternative to approval of family units in a high-rise elevator building, in the meaning of Section 881.111(a) [24 C.F.R. 202(d) (1980)].

Plaintiffs' Exhibit 87 is the form proposal rating sheet that was used by the Area Office to rate the Monterey Apartments. It indicates that Monterey was given a 37.5 rating which included 3 points for a location in the general public housing area. Nothing on the sheet indicates a credit or penalty for low-rise versus high-rise buildings. This sheet was prepared by Barnas.

Plaintiffs' Exhibit 90 also prepared by Barnas after the final round of ranking the preliminary proposals submitted in response to NOFA 52, indicates the relative rankings of all the proposals considered for funding. This list ranks Monterey seventh out of 28 ranked projects. Three projects were considered inappropriate for funding because they were located in an area of low income or minority concentration.

Of all the proposals received by HUD in response to NOFA 48, only one proposal was made for family housing in the Uptown Community Area. This was a proposal for a project located at Sheridan Road and Ainslie Street, approximately one mile northwest of Monterey Apartments. Of all the proposals received by HUD in response to NOFA 52, only the Monterey Apartments and Peterson Plaza were located in Uptown. Peterson Plaza is over three miles northwest of Monterey Apartments.

Mr. Steven Hans is the Housing Director for HUD's Chicago Area Office. The Housing Division is divided into three sub-units, one of which is responsible for multi-family housing development. The Housing Director, the Area Manager, and the Deputy Area Manager are ultimately responsible for the approval of applications for Section 8 funds.

Mr. Hans testified that § 1437f(c)(1) and 24 C.F.R. § 881.202(d) (1980) require a determination by HUD before approving Section 8 funding for high-rise elevator structures intended for families with children.

Plaintiffs' Exhibit 102 is an excerpt from HUD's "Section 8 Housing Assistance Payments Program Substantial Rehabilitation Processing Handbook" in effect at the time the Monterey proposal was processed. This handbook was issued by HUD's Washington Office to serve as a processing guide for field offices and program participants.

A comment contained at paragraph 12, page 32, of that handbook states in pertinent part:

The fact that a high rise elevator structure proposed for rehabilitation already has families in occupancy does not in itself make the requirement [that HUD make a "no practical alternative determination"] inapplicable, but is relevant in making the required determination. For example, if all the proposals submitted in response to a NOFA for an area provide for high rise elevator projects for families with children, this would be evidence that there is no practical alternative for that type of housing.

In April of 1979, four months after NOFA 48 was published and after the Area Office officials had determined that the quality of the proposals submitted did not justify funding, the Area Office held two meetings with project sponsors and developers who had submitted proposals. The purpose of the meeting was to determine why the quality of proposals was so low in terms of sites and other factors. At these meetings Area Office officials indicated that they would consider approval of appropriate high-rise elevator proposals to house small families.

Mr. Hans also testified that in the initial stages of the Area Office's processing of a proposal, no consideration is given to the fact that a particular proposal calls for high-rise elevator structures to house families, rather, consideration of a project is limited to whether a particular proposal will provide appropriate housing in an area in which there is need.

In addressing whether there was a practical alternative to the Monterey, Hans considered the fact that

these are family units in a general area [as used in *Gautreaux*], this is rehabilitation, and given the nature of what was being submitted, given the nature of the rejects that had already been arrived at by staff, that there was no practical alternative except to go ahead with this project.

There can be no doubt, based on the evidence adduced at the hearing that the Monterey proposal was of a higher quality than other proposals received by HUD in response to NOFA 52 that were not funded. The project was in the general public housing area, within one block of Lincoln Park, with easy access to mass transportation facilities and above average commercial services. The design components of the proposal were consistent with HUD policy. Moreover, the rehabilitation of the Monterey Apartments would further the goals of the City of Chicago's housing assistance plan as well as policies of the Northeastern Illinois Planning Commission (NIPC). NIPC is designated as the areawide clearinghouse pursuant to Office of Management and Budget Circular A–95. *See* 24 C.F.R. § 891.202. NIPC encouraged more attention to projects that provide rehabilitation of housing in "mature urban areas" such as Uptown.

Finally and significantly, Mr. Hans testified that no practical alternative existed with respect to the Monterey because of the economic constraints imposed on HUD in funding Section 8 housing. Hans' testimony established that given the purchase price of the Monterey property of approximately $1,100,000, a low-rise apartment project could never be undertaken on property such as the Monterey unless HUD was permitted to consider cost factors.

It just makes practical common sense. If the land is a million dollars, and assume this is roughly a four million dollar rehabilitation mortgage, as I remember, the land and building is that million dollars, and this is a four million dollar mortgage ... [a]ssume it is 100 units in the project, it is about $40,000 a unit. The land is a million dollars, and a row house walk-up, take a number, ten units to the acre, 20 units to the acre, it doesn't matter, if it is ten units to the acre then the [cost per unit of the] land would be about $100,000 ... It is irresponsible. That is no longer low and moderate income housing. And you cannot build horizontally if you have to pay a million dollars for land. It is that simple. Transcript at 365–66.

With respect to this court's review of the Area Office's determination that there was no practical alternative to housing families in the Monterey Apartments, the court is mindful of its duty to construe the applicable statutory language from which HUD derived 24 C.F.R. § 881.202(d).

42 U.S.C. § 1437f(c)(1) provides in pertinent part that:

Notwithstanding any other provision of this section, after October 12, 1977, the Secretary shall prohibit high-rise elevator projects for families with children unless there is no practical alternative.

The HUD regulation enacted pursuant to this language states:

High-rise elevator projects for families with children are prohibited unless HUD determines that there is no practical alternative.

The source of the "no practical alternative" limitation on the Section 8 program was the house version of the statutory provision under discussion. The Banking, Finance and Urban Affairs Committee report on H.R. 6655 contained the following discussion relevant to this court's construction of the high-rise prohibition:

The committee has become concerned about the increasing costs of construction of section 8 housing. Through efficient management and by other efficiencies the committee intends these increases can be kept in check. To encourage greater efficiency the committee has included a requirement in the bill that contracts for section 8 assistance cannot be made for units in which the debt service, plus any FHA premium, exceeds $100 per room.

However, the committee also expects that the Secretary will exercise strict oversight in situations where high-rise projects are proposed for low-income families. In keeping with section 6 of the United States Housing Act of 1937, *the Secretary should not permit high-rise elevator projects for families with children unless there is no practical alternative.* (emphasis added)

H.R.Rep.No.236, 95th Cong., 1st Sess. 14, reprinted in [1977] U.S.Code Cong. & Ad. News 2884 at 2897.

The relevant portion of Section 6 of the United States Housing Act of 1937 referred to in the report was enacted as Section 201(a) of the Housing and Community Development Act of 1974, 42 U.S.C. § 1437d(a), and contained language virtually identical to the language of 42 U.S.C. 1437f(c)(1).

It is clear from the committee report that Congress considered cost factors to be relevant to a "no practical alternative" determination. *Cf. Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 at 411–413, 91 S.Ct. 814, at 821–22, 28 L.Ed.2d 136 (1971).

Also supporting this court's interpretation of the statutory language is the legislative history of Section 207 of the Housing and Urban Development Act of 1968, Pub. L.No.90–448, 82 Stat. 476, which enacted an almost identical statutory requirement for public housing.[2] The legislative history of that Act indicates that "no practical alternative" determinations apply to "those situations where site availability or cost considerations preclude the provision of housing which is more suitable for family life." H.R.Rep.No.1585, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News 2873 at 2903.

In light of this legislative history it seems clear that HUD was authorized to make a "no practical alternative" determination with regard to the Monterey propos-

al. This court believes that HUD officials properly considered the site desirability and cost factors and that their approval of the Monterey proposal was not "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." This court believes that the plaintiffs' position, if accepted in this case, would result in the virtual exclusion of Section 8 housing from many desirable, but expensive lake-front areas of Chicago, thus defeating one of the primary goals of the program—promotion of "economically mixed housing."

Plaintiffs' fourth ground for setting aside HUD approval of assistance for the Monterey project is premised on the language of 12 U.S.C. § 1715*l*(d)(2) which states in pertinent part:

To be eligible for insurance under this section, a mortgage shall—

(1) have been made to and be held by a mortgagee approved by the Secretary as responsible and able to service the mortgage properly;

(2) be secured by property upon which there is located a dwelling conforming to applicable standards prescribed by the Secretary under subsection (f) of this section, *and meeting the requirements of all State laws, or local ordinances or regulations, relating to the public health or safety, zoning, or otherwise, which may be applicable thereto* . . . (emphasis added)

In determining that the Monterey Apartments proposal conformed to this statutory requirement HUD relied on the fact that the City of Chicago had issued building permits for the proposed rehabilitation. HUD officials also considered a legal opinion supplied by the developer defendants at the time of closing. This court sees no indication that HUD abused its discretion in relying on these materials to determine the propriety of providing mortgage insurance on the project.

**2.** Section 207 provides, "Except in the case of housing predominantly for the elderly, upon enactment of this paragraph, the Secretary shall not approve high-rise elevator projects for families with children unless he makes a deter-

mination that there is no practical alternative." This provision was formerly codified at 42 U.S.C. § 1415 (1970) and was the source of the language used in the 1974 revision of section 6 of the United States Housing Act of 1937.

Therefore, with respect to the federal defendants, this court is of the opinion that plaintiffs have failed to establish a likelihood of success on the merits on the first two counts of their complaint.

### B. *Irreparable Harm*

The plaintiffs have failed to persuade this court that they will suffer irreparable harm for which there is no adequate remedy at law if the injunction does not issue. *See* above pp. 1226–1227.

### C. *Balance of Hardships*

The balance of hardships between the parties favors the denial of a preliminary injunction.

### D. *The Public Interest*

■ Lower-income residents of the City of Chicago and especially those who have been and are being displaced by private investment in Uptown are in need of safe, decent and sanitary housing and would be harmed by the issuance of a preliminary injunction. The public interest would be disserved by the grant of a preliminary injunction.

### CONCLUSION

The plaintiff's motion for a preliminary injunction is denied. Plaintiffs have failed to show a reasonable likelihood of success on the merits, or a threat of irreparable harm if the injunction does not issue.

The defendants' motion to dismiss Count III of the plaintiffs' complaint (the state claim) is granted.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.