686 F.2d 472
 Frank ALSCHULER, Diane Sokolofski, Morton Weisman and the
Hutchinson-Hazel- Junior Terrace Association,
Plaintiffs-Appellants,
v.
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, Elmer C.
Binford, Lawrence B. Simons, Monterey Apartments, a
California Limited Partnership, Sabina Realty Corporation,
G. Bliudzius Contractors, Inc., ADC Mortgage Corporation,
Ranbir S. Sahni, George Gottfried and unknown Partners of
Monterey Apartments, Defendants-Appellees.
 No. 81-1904.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1981.
Decided Aug. 4, 1982.
 
 Rueben L. Hedlund, Chicago, Ill., for plaintiffs-appellants.
 Edna Selan Epstein, Sidley & Austin, Michael S. O'Connell, Fredick H. Branding, Asst. U. S. Attys., Chicago, Ill., for defendants-appellees.
 Before BAUER and WOOD, Circuit Judges, and EVANS, District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Plaintiffs, a local neighborhood association and three of its members, filed suit to enjoin HUD from disbursing housing assistance funds and providing mortgage insurance for a HUD-approved low-income housing project in the Uptown area of Chicago's North Side, and to enjoin occupancy and further construction of the project. The complaints also named the project developers as defendants. After eleven days of hearings, the district court denied plaintiffs' motion for a preliminary injunction and dismissed their pendent state claim. See Alschuler v. HUD, 515 F.Supp. 1212 (N.D.Ill.1981). This appeal followed.
 
 I. Background
 
 2
 This action arises under various federal statutes and regulations controlling HUD's authority to implement the objectives of the national housing policy. Section 8 of the United States Housing Act of 1937 authorizes HUD to enter into contracts to provide housing assistance payments on behalf of eligible low-income tenants. 42 U.S.C. § 1437f (1976 & Supp. IV 1980) (as amended). Pursuant thereto HUD promulgated a set of comprehensive regulations governing the approval of section 8 funding for substantially rehabilitated housing such as the project at issue here. 24 C.F.R. Pt. 881 (1981). Those regulations establish specific standards for site and neighborhood selection and project eligibility. In pertinent part, 24 C.F.R. §§ 881.206(b) and (c) require that the proposed site further full compliance with Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act"), 42 U.S.C. §§ 3601 et seq.,[1] and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons, respectively. The regulations also provide that high-rise elevator projects for families with children are prohibited unless there is no practical alternative, 24 C.F.R. § 881.202(d); see 42 U.S.C. § 1437f(c)(1), and that all projects must comply with applicable local ordinances, 24 C.F.R. § 881.207(f). To further encourage private investment and participation in furnishing decent housing for low-income people, the National Housing Act of 1954 authorizes HUD to insure mortgages secured by property on which is located a dwelling conforming to the standards for section 8 assistance and "meeting the requirements of all ... local ordinances or regulations, relating to the public health or safety, zoning or otherwise, which may be applicable thereto." 12 U.S.C. § 1715l (d)(2) (1976 & Supp. IV 1980) (as amended).
 
 
 3
 The factual background of this matter is set forth in detail in the district court's opinion. 515 F.Supp. 1212. The basic facts are not disputed; rather, the controversy centers on the legal significance to be attached thereto. We therefore recount only so much as is essential to an understanding of our decision.
 
 
 4
 In June 1979, HUD received from private defendants a preliminary proposal for 82 units of family section 8 housing to be located in the Uptown Community Area. The proposal called for substantial rehabilitation of two adjacent apartment buildings, one a nine-story elevator building and the other a three-story building containing three apartments (collectively, the "Monterey project"). After a one-year period of processing the application, HUD gave final approval for mortgage insurance and rental assistance. Before doing so, HUD determined, inter alia, that the buildings were not located in an area of low-income or minority concentration and would not create an undue concentration of assisted or minority persons in the vicinity, and that there was no practical alternative to approval of the nine-story elevator building. HUD based its determination primarily on 1970 census data on the racial and economic make-up of census tract 321 (in which the project was located),[2] census tracts contiguous with tract 321, and the Uptown Community as a whole, but considered other indicators as well. HUD had ranked the Monterey project seventh out of 28 proposed projects on the basis of several criteria pertaining to project desirability. In particular, Monterey was found to be located in a relatively attractive area with several parks and playgrounds, good public transportation, and above average commercial and community services. The quality of the Monterey apartments and the extensive private investments in restoring the neighborhood also impressed HUD officials.
 
 
 5
 HUD further determined that the buildings conformed to all applicable local ordinances. That conclusion was based on a building permit issued by the Chicago Building Department and a legal opinion letter supplied by the developer at the time of closing.
 
 
 6
 Plaintiffs alleged as a federal claim that HUD's action in approving Monterey was arbitrary and capricious for the following reasons. First, HUD in effect ignored the statutory prohibition against high-rise elevator projects for families with children. Second, the proposed rehabilitation violates the Lake Michigan and Chicago Lakefront Protection Ordinance, Chicago, Ill., Municipal Code, ch. 194B (1973) ("Lakefront Protection Ordinance"), because it was not submitted to the Chicago Plan Commission for approval. Third, HUD relied on outdated data to determine the concentration of low-income and minority people in the area and failed to define the relevant area for the purpose of making those determinations. Plaintiffs further asserted the violation of the Lakefront Protection Ordinance as a pendent state claim against the private defendants.
 
 
 7
 The district court, denying preliminary injunctive relief, ruled that plaintiffs had failed to show a reasonable likelihood of success on the merits of their federal claim. The court also dismissed the state claim, finding that plaintiffs had no private right of action under Illinois law.
 
 II. Federal Claim
 Standing
 
 8
 The district court ruled that plaintiffs, as neighborhood residents, have standing to challenge HUD's decision approving the Monterey project. 515 F.Supp. at 1227-28. In response to plaintiffs' appeal on the federal claims, defendants reassert their position in the proceedings below that plaintiffs lack standing. Because standing affects jurisdiction, and all parties have had an opportunity to brief the issue on appeal, we review the district court's conclusion on that threshold inquiry.
 
 
 9
 The concept of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). To satisfy the "case and controversy" requirement of Article III, a plaintiff must allege a sufficient personal stake in the outcome of the dispute to ensure that the matter to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 151-52, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). In other words, "the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). As an added prudential limitation, section 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, under which we assume each facet of the federal claim arises, requires that plaintiffs be "adversely affected or aggrieved within the meaning of the relevant statute." The Supreme Court in Camp construed this to mean that the alleged injury must be to an interest "arguably within the zone of interests to be protected or regulated by the statute ... in question." 397 U.S. at 153, 90 S.Ct. at 830.
 
 
 10
 Plaintiffs alleged as an injury-in-fact that HUD's approval of the Monterey project will cause substantial harm to their neighborhood by creating an imbalance in the minority and low-income population, breeding an increase in crime, and placing an added strain on community resources. They also contend that their property values and the "special environmental, recreational, cultural, historical and aesthetic qualities of the Lake Michigan and Chicago Lakefront Protection District" will be adversely affected. See 515 F.Supp. at 1216. The district court ruled that plaintiffs' allegation of threatened injury satisfied the Article III standing requirement. Id. at 1227. On appeal defendants argue that this conclusion contradicts the court's more specific finding that plaintiffs had failed to establish the harm necessary to obtain a preliminary injunction. See Id. at 1226-27, 1239. That finding, however, was made upon a motion for a preliminary injunction, not summary judgment, and thus is not conclusive of the merits. We must, therefore, take as true plaintiffs' allegations of threatened injury in the pleadings.[3] Jenkins v. McKeithen, 395 U.S. 411, 421-24, 89 S.Ct. 1843, 1848-49, 23 L.Ed.2d 404 (1969); cf. Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 53-54, 96 S.Ct. 1917, 1931, 48 L.Ed.2d 450 (1976) (Brennan, J., concurring). Those allegations are sufficient to confer Article III standing.[4] See South East Lake View Neighbors v. HUD, 685 F.2d 1027 No. 81-2104 (7th Cir. 1982).
 
 
 11
 The district court also concluded that plaintiffs satisfied the zone of interests test. 515 F.Supp. at 1228. Defendants contend that section 8 is intended solely for the benefit of the project tenants and that plaintiffs, as mere incidental beneficiaries, have no standing. See Dialysis Centers, Ltd. v. Schweiker, 657 F.2d 135, 138 (7th Cir. 1981).
 
 
 12
 The zone of interests test requires making a separate analysis of standing for each claim raised. Society Hill Civic Association v. Harris, 632 F.2d 1045, 1058 n.8 (3d Cir. 1980). As in any case of statutory interpretation, we must "examine the language of the relevant statutory provision, the pertinent regulations, and the legislative history to discern the parameters of the relevant zone of interest and to determine whether the interest of (plaintiffs) arguably falls within the zone." Peoples Gas, Light & Coke Co. v. United States Postal Service, 658 F.2d 1182, 1195 (7th Cir. 1981).
 
 
 13
 Plaintiffs' standing to claim that Monterey will tip the racial balance of their neighborhood must be examined in the context of section 808(e)(5) of the Fair Housing Act, 42 U.S.C. § 3608(d)(5). Section 808(e)(5) requires administration of HUD programs "in a manner affirmatively to further the policies of this subchapter." (emphasis added). That language reveals a clear identity of purpose between section 808(e)(5) and the Fair Housing Act as a whole. See Peoples Gas, 658 F.2d at 1196 & n.11 (regulation at issue adopted pursuant to enabling act which authorized the adoption of rule "to accomplish the objectives of this title"). The legislative history to related sections of the Act consequently takes on added significance in delineating the proper zone of interests. Id.
 
 
 14
 Construing section 810(a) of the Act, 42 U.S.C. § 3610, which establishes a private right of action for any "person aggrieved" by a discriminatory housing practice, the Court in Trafficante v. Metropolitan Life Insurance Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), held that Congress intended to define standing as broadly as is permitted by Article III. In reaching that conclusion the Court read the Act as recognizing that even those who are not direct objects of discrimination have an interest in ensuring fair housing. Id. at 210, 93 S.Ct. at 367. As the Court declared, "(t)he person on the landlords blacklist is not the only victim of discriminatory housing practices; is it, as Senator Javits said in supporting the bill, 'the whole community,' 114 Cong.Rec. 2706, and as Senator Mondale who drafted § 810(a) said, the reach of the proposed law was to replace ghettos 'by truly integrated and balanced living patterns,' Id. at 3422." 409 U.S. at 211, 93 S.Ct. at 368. See Gladstone, Realtors, 441 U.S. at 100-09, 99 S.Ct. at 1608-12, and Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 24 (1982) (white neighborhood residents have standing under section 812, 42 U.S.C. § 3612, in action against practices which prevented integration). This generous view of the Act makes clear that plaintiffs are within the zone of interests to be protected and therefore have standing under the APA[5] to challenge HUD's decision as contrary to the mandate of section 808(e)(5). See, e.g., Shannon v. HUD, 436 F.2d 809, 817-18 (3d Cir. 1970);[6] Jorman v. Veterans Administration, 500 F.Supp. 460, 464 (N.D.Ill.1980); Jones v. Tully, 378 F.Supp. 286, 287 n.1 (E.D.N.Y.1974), aff'd sub nom. Jones v. Meade, 510 F.2d 961 (2d Cir. 1975).
 
 
 15
 Before we analyze the other statutory provisions and regulations that comprise plaintiffs' general federal claim, it is helpful, if not essential, to place into proper perspective some of the basic goals of the federal housing program. The United States Housing Act of 1937, 42 U.S.C. §§ 1437-1437j (1976 & Supp. IV 1980) (as amended), which contains the section 8 provision, id. § 1437f, was originally enacted to "remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income." Sept. 1, 1937, ch. 896, § 1, 50 Stat. 888 (emphasis added) (current version at 42 U.S.C. § 1437). But in the Housing and Community Development Act of 1974, Congress amended the 1937 Act as part of a broader effort "to consolidate and simplify existing programs," S.Rep.No.93-693, 93d Cong., 2d Sess. 1, reprinted in (1974) U.S.Code Cong. & Ad.News 4273 ("Senate Report"), and in doing so, coordinated the section 8 program with the broader goals of the community development program. The objectives of the community development program-"to eliminate slums and blight and to upgrade and make the nation's cities more livable, attractive and viable places in which to live"[7]-were to be articulated and implemented by HUD-approved local housing assistance plans ("HAP"s). 42 U.S.C. § 5304. As a bridge between the two programs, Congress added 42 U.S.C. § 1439, which requires the Secretary to consider the HAPs in determining whether to approve section 8 funding. Pub.L.No.93-383, Title II, § 213, Aug. 22, 1974, 88 Stat. 674. Stressing the importance of this interprogram approach,[8] Congress in 1977 amended section 1439 to require the Secretary to "assure, to the maximum extent practicable in carrying out the national housing and community development objectives, that funds ... shall be allocated or reserved in accordance with the goals described in local, state, or other housing assistance plans approved by the Secretary pursuant to section 5304 of this title...." Pub.L.No.95-128, Title II, § 207, Oct. 12, 1977, 91 Stat. 1130.
 
 
 16
 The 1974 and 1977 revisions reveal that although the primary goal of section 8 is to provide decent housing for the poor, its secondary concern is to develop and maintain stable, desirable urban communities. We therefore believe that many, but not necessarily all, of the specific site, neighborhood, and project standards may arguably encompass the interests of people in the relevant community.[9] See Lower Moreland Homeowner's Association v. HUD, 479 F.Supp. 886, 895-96 (E.D.Pa.1979).
 
 
 17
 In particular, plaintiffs are arguably within the zone of interests to be protected by the regulation requiring HUD to avoid an undue concentration of assisted persons, 24 C.F.R. § 881.206(c). So far as we can discern, this regulation was derived from the statutory provisions of the community development program. When Congress enacted the Housing and Community Development Act of 1974, it explicitly recognized that "the Nation's cities ... face critical social, economic, and environmental problems arising in significant measure from ... the concentration of persons of lower income in central cities." Pub.L.No.93-383, Title I, § 101(a), Aug. 22, 1974, 88 Stat. 633 (codified at 42 U.S.C. § 5301(a)). To combat these problems Congress required that each HAP "indicate the general locations of proposed housing for lower-income persons, with the objective of ... avoiding undue concentrations of assisted persons in areas containing a high proportion of low-income persons." 42 U.S.C. § 5304(a)(4)(C)(ii). Section 8 was simultaneously amended to read that it is "For the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing...." Pub.L.No.93-383, Title II, § 201(a), Aug. 22, 1974, 88 Stat. 662 (codified at 42 U.S.C. § 1437f(a)); see also 42 U.S.C. § 1439(d)(1) (in allocating assistance funds HUD must consider needs of different communities "as reflected in data as to ... poverty").
 
 
 18
 The legislative history to the 1977 amendments to 42 U.S.C. § 5304 sheds additional light on the range of interests Congress intended to protect:
 
 
 19
 The committee bill adds a requirement that an application for block grant funds describe a program to improve conditions for low- and moderate-income persons residing or expected to reside in the community and foster neighborhood development to induce higher income individuals to remain in or return to the community.
 
 
 20
 The committee believes that while it clearly intends that communities focus their strategies toward assisting low- and moderate-income persons, it is also appropriate for communities to take into account the need for maintaining urban viability by encouraging higher income persons to remain in or return to the community, particularly the older, central cities. It is recognized that middle- and upper-income persons are essential for urban viability, and a community's strategy must take into account the housing trends of these groups when providing for low- and moderate-income persons in order for the strategy to be a comprehensive one.
 
 
 21
 H.Rep.No.95-236, 95th Cong., 1st Sess. 11, reprinted in (1977) U.S.Code Cong. & Ad.News 2884, 2894.[10] See Keating & Gates, Who Should Benefit from the Community Development Block Grant Program ? 10 Urb.Law. 701, 709 (1978). We believe that persons residing in the target area have standing to assert their interest in maintaining an economically balanced neighborhood. Accord, Shannon v. HUD, 387 F.Supp. 5, 7 (E.D.Pa.1974).
 
 
 22
 Although the general policies of the Act of 1974 evidence a concern for quality of life for all residents in communities targeted for housing assistance, certain site selection standards were clearly intended only for the benefit of the prospective project inhabitants. The high-rise prohibition, 42 U.S.C. § 1437f(c)(1); 24 C.F.R. § 881.202(d), falls within that category. Allapattah Community Association, Inc. v. Landrieu, 502 F.Supp. 436 (S.D.Fla.1980). The legislative history to the original high-rise limitation, Housing and Urban Development Act of 1968, Pub.L.No.90-448, Title II, § 207, 82 Stat. 504 (1968) (amending § 15 of the Act of 1937, 42 U.S.C. § 1415),[11] noted that "high-rise, elevator structures provide an undesirable environment for family living and should be developed for families with children only in those situations where site availability or cost considerations preclude the provision of housing which is more suitable for family life." H.Rep.No.1585, 90th Cong., 2d Sess., reprinted in (1968) U.S.Code Cong. & Ad.News 2873, 2903 (emphasis added). When the 95th Congress recodified that limitation in section 8, the concern once again focused on the inhabitants rather than the surrounding neighborhood: "We know these buildings do not work, that they hurt the people in them ... we really must stand up for these people." 123 Cong.Rec. 14370 (remarks of Rep. Fenwick). On a related crime prevention amendment, Representative Fenwick further explained "that it has been proved that crime against inhabitants of low-rise housing is 9 per 1,000, whereas in high rises it is 20 per 1,000, more than double. It makes a difference what kind of housing we have. We subject these people in high rises to conditions that are intolerable." Id. at 14374; see also id. at 14373 (remarks of Rep. Solarz); id. at 14374 ("not only is it unfair to families who live in high rises, but we ought to be thinking about the elderly who live in high rises because it is unsafe for them also") (remarks of Rep. Oakar).
 
 
 23
 Where the intent of Congress to protect only very specific interests is clear, it is inappropriate to look to other statutory provisions, which may evidence different concerns, to expand the zone of interests. See Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 140-41 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Plaintiffs have no standing to raise any complaint based on regulatory or statutory provisions designed solely for the protection of residents of the complex.[12] Richland Park Homeowners Association, Inc. v. Pierce, 671 F.2d 935, 944 (5th Cir. 1982).
 
 
 24
 Much less clear is whether plaintiffs have standing to complain about noncompliance with the Lakefront Protection Ordinance under 24 C.F.R. § 881.207(f) and 12 U.S.C. § 1715l (d)(2). Other courts have held that purchasers of homes whose mortgages were insured under section 221 of the National Housing Act, 12 U.S.C. § 1715l, have standing to seek judicial review of administrative decisions violating local housing codes. See, e.g., Davis v. Romney, 490 F.2d 1360 (3d Cir. 1974). In Davis, the court rejected the defendants' contention that the court must look only to the particular statutory provision at issue, and instead agreed with the district court's examination of the whole statute to determine whether plaintiffs were "aggrieved ... within the meaning of the relevant statute." Id. at 1365. An examination of the particular provision and its sparse legislative history provides us with no definitive answers. Since the interests intended to be protected are unclear, we believe that the broad policies of the Housing and Community Development Act of 1974, which also in part amended the National Housing Act of 1934, bring plaintiffs "arguably within the zone of interests to be protected." See Society Hill Civic Association, 632 F.2d at 1058 (analogous requirement under 24 C.F.R. § 880.205(h) (1979)). Moreover, the HUD regulation in question was first adopted as part of the major overhaul of section 8 regulations after enactment of the 1974 Act. See 24 C.F.R. § 1277.103(i)(3)(vi) (1975) (added 39 Fed.Reg. 45132 (1974)). That limitation may have been designed not only as a matter of federal-state comity or to protect inhabitants but also to ensure that the site location does not undermine the community interests which many zoning ordinances seek to protect. Where congressional intent is ambiguous, it is appropriate to bear in mind that, as this court has previously noted, the zone of interest test is a "generous standard."[13] Peoples Gas, 658 F.2d at 1195.
 
 Standard of Review
 
 25
 Our review of HUD's decision to approve Monterey is very limited. 5 U.S.C. § 706(2)(A); Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). We are guided by the Supreme Court's oft-cited language in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):
 
 
 26
 Scrutiny of the facts does not end ... with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." ... To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
 
 
 27
 Id. at 416; South East Chicago Commission v. HUD, 488 F.2d 1119, 1129 (7th Cir. 1973). HUD is vested with considerable discretion to implement the various and often competing goals of the national housing policy. See Strycker's Bay Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980). Before approving an application for section 8 assistance or mortgage insurance, HUD must weigh a number of considerations pertaining to site location, no one of which is necessarily controlling. See Shannon, 436 F.2d at 822. Here, for example, HUD gave the Monterey proposal a high rating in comparison to several other proposals on the basis of many factors, including the need for low-income housing in the area and other amenities the particular location would provide. Our task is not to second-guess the wisdom of HUD's decision. It is enough that HUD made an informed determination based on a consideration of the relevant factors. See Aersten v. Landrieu, 637 F.2d 12, 22 (1st Cir. 1980); South East Chicago, 488 F.2d at 1128-29; cf. Strycker's Bay, 444 U.S. at 227, 228 n.2, 100 S.Ct. 499, 500 (NEPA).
 
 
 28
 Our inquiry is further circumscribed by the standard of review applicable to the denial of a preliminary injunction. This court will not disturb the district court's ruling absent "a showing from the totality of the factors that a clear abuse of the trial court's discretion has occurred or that the court's findings were clearly erroneous or represent a certain mistake of law." Menominee Rubber Co. v. Gould, Inc., 657 F.2d 164, 166 (7th Cir. 1981).
 
 Site Selection Criteria
 
 29
 Congress imposed on HUD a substantive obligation to promote racial and economic integration in administering the section 8 program. 42 U.S.C. §§ 1437f(a), 3608(d)(5); see King v. Harris, 464 F.Supp. 827 (E.D.N.Y.), aff'd sub nom. without op. King v. Faymor Development Co., 614 F.2d 1288 (2d Cir. 1979), vacated, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256, aff'd on remand without op., 636 F.2d 1202 (2d Cir. 1980). HUD's regulations substantially comply with this mandate:
 
 
 30
 Proposed sites for substantial rehabilitation projects must be approved by HUD as meeting the following standards:
 
 
 31
 (b) The site and neighborhood must be suitable from the standpoint of facilitating and furthering full compliance with the applicable provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, Executive Order 11063, and HUD regulations issued pursuant thereto.
 
 
 32
 (c) The site must promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons.
 
 
 33
 24 C.F.R. §§ 881.206(b), (c). As part of HUD's duty under the Fair Housing Act, an approved housing project must not be located in an area of undue minority concentration, which would have the effect of perpetuating racial segregation. Otero v. New York City Housing Authority, 484 F.2d 1122 (2d Cir. 1973); Shannon, 436 F.2d at 820.
 
 
 34
 To implement these obligations, HUD must "adopt some adequate institutional means for marshalling the appropriate legislative facts" necessary to make an informed decision on the effects of site selection on the area. Shannon, 436 F.2d at 821. King, supra, upon which plaintiffs place sole reliance in challenging HUD's approval, held this to mean that the determination of low-income and minority concentration must be based on the most current available demographic information pertaining to the "relevant area." We are not called upon to review HUD's evaluation of the relevant data, but only to determine whether the data used was appropriate. See Strycker's Bay, supra.[14]
 
 
 35
 The Economics and Marketing Analysis Division of HUD ("EMAD") determined that Monterey would comply with 24 C.F.R. § 881.206(c). The evidence shows that EMAD considered several factors, including the following. A comparison of the total number of federally assisted housing units at the time (1979) to the total number of housing units as of 1970 in census tract 321, census tracts contiguous with tract 321, and the Uptown Community Area as a whole, revealed percentages well below what HUD considered a "warning point" of twenty-five percent. See 515 F.Supp. at 1221, 1231-32. The Chicago Housing Assistance Plan designated the Uptown Conservation Area as a priority area for section 8 housing development. Considering the probable effect on other nearby subsidized housing, a loan management specialist also concluded that there was a need for more such housing in the area. Moreover, marketplace indicators, such as high rents in the area and the acquisition price of the property, reflected that the area was not low-income. The substantial amount of private investment in the area similarly suggested economic stability. Finally, consideration was given to whether the 100% subsidized project contained so many units that it alone could materially affect the economic balance of the neighborhood.
 
 
 36
 The Fair Housing and Equal Opportunity Division of the Chicago Area Office determined that the site location would comply with Fair Housing Act policies. Census data for 1970 for tract 321, surrounding tracts, and Uptown generally revealed that the area was not minority concentrated. See 515 F.Supp. at 1223, 1233. An Equal Opportunity specialist admitted that no independent effort was made to check the current accuracy of that data. In the preliminary proposal, however, the developer included a statement that the "neighborhood"[15] population was presently 57% white, 18% black, 23% Spanish-American, and 2% other. The developer also submitted an Affirmative Fair Housing Marketing Plan ("AFHMP") which predicted a tenant profile for Monterey of 41 white, 17 black, 12 Spanish-American, 4 American Indian, and 7 Oriental occupied apartments. HUD found the plan reasonable in view of the developer's proposed outreach efforts and the racial composition of the city as a whole. HUD additionally considered that the site is located in the General Public Housing Area ("GPHA") which, as defined in the Gautreaux injunction, Gautreaux v. Chicago Housing Authority, 304 F.Supp. 736, 737-38, 742 (N.D.Ill.1969), consists of all census tracts which are not located within one mile of a census tract having a thirty percent or more non-white population.[16]
 
 
 37
 In King, supra, the district court examined the adequacy of the statistical base for HUD's decision to approve a proposed 96 unit section 8 project located in the southeast corner of census tract 29 on Staten Island. HUD had relied exclusively on 1970 census data for tract 29 alone, which depicted a total population of 4,623 with only a 12.8% minority population. The court found HUD's action to be arbitrary and capricious. The site for the project, though located in tract 29, was across the street from tract 27 to the east and only 300 feet away from tract 40 to the south. Particularly crucial to the court's decision was that tract 29 failed to reflect the impact of several major housing projects located in tract 40 only 1500 to 3200 feet from the proposed site. In 1978, four of those projects had a combined minority occupancy of approximately 97%, or a gross minority population of 3,677 which was equal to almost 80% of the entire 1970 population of tract 29. 464 F.Supp. at 833 n.15. The 1970 census figures for tract 29 similarly did not convey the story of the dramatic change that had occurred in the character of the surrounding neighborhood. According to the court, tract 29 was "dominated by the Stapleton Houses Project," which had a population of 2,500 tenants and was situated across the street from the proposed site. Id. at 833. That project alone shifted from a 19.3% minority population in 1970 to 74.9% in 1978 and underwent an increase from 36 to 285 in the number of families receiving public assistance during that period. Id. Other, more current evidence pertaining to tract 29 showed significant deterioration of the main business district, a marked increase in crime, severely overburdened neighborhood services and facilities, a concentration of minority and low-income students in the public schools, and a clear lack of need for additional low-income housing. Id. at 834-36. In view of the "overwhelming evidence," the district court concluded that "(t)he area is in a state of deterioration with no signs of revitalization (and) already concentrated with high-rise dwelling units with undue concentrations of low-income, minority families." Id. at 836.
 
 
 38
 HUD had "ignore(d) blatant indicators of concentration," id. at 841, and admitted that the 1970 data was clearly outdated, id. at 840. The court noted that the updated data plaintiffs had presented "was readily accessible and easily compiled." Id. at 840. In fact, EMAD had disapproved the proposal because the site was "impacted with subsidized housing" and had indicated that the 1970 census data was currently inaccurate. Id. at 831-32. Other evidence suggested that HUD had used the 1970 census tract 29 figures in an attempt to disguise the impact of the proposed project.
 
 
 39
 Analyzing the decision-making process in three steps, the court found that HUD had failed to define the relevant area and ascertain the current minority and low-income concentration within that area, and as a result, had incorrectly concluded that the proposed project would not have a "tipping" effect on the area. The court reasoned that census tracts do not necessarily reflect neighborhood boundaries-thus HUD cannot rely on census tracts alone where it results in a materially distorted view of minority concentration. Id. at 840. The court also said that HUD must not base its determination on outdated census statistics "when readily accessible information clearly dispute(§ those) figures." Id. at 841. In particular, the court found that the "plaintiffs established the availability of data which seriously undermined HUD's conclusions." Consequently, rather than merely await the 1980 census data, HUD was obligated to compile independently further, updated information.
 
 
 40
 Plaintiffs here argue first that HUD ignored its duty under King by failing to delineate the relevant area. Plaintiffs interpret King to say that census tracts may never be used as sole indicators of the racial and economic composition of the area, and in effect urge this court to hold that HUD must define with surveyor's precision and certainty the boundaries of the relevant area and ascertain the minority and low-income concentration within that exact area. The King opinion contains some broad language criticizing HUD's reliance on census tract boundaries in vacuo and calling for ad hoc determinations. 464 F.Supp. at 839. As the court in King reasoned, census tracts are artificial boundaries, drawn without reference to the factors relevant to the congressional concerns underlying the section 8 site location standards. Thus, the court offered the following approach:
 
 
 41
 In general, a neighborhood represents any section of a region or city, having indefinite boundaries, and which is drawn together by the shared perceptions of its residents as to what constitutes their neighborhood, by the facilities generally available for their use, by their social and economic status, and by natural or man made physical boundaries.
 
 
 42
 While certain excerpts of the King opinion may support plaintiffs' interpretation, we believe the opinion, when read as a whole and in the context of its facts, admits of a much narrower construction. The court specifically held that HUD may not rely on census tracts "(w)here, as here, such boundaries distort the racial composition of a neighborhood and lead to an undue concentration of minorities in a small area." Id. at 840 (emphasis added). Unlike in King, HUD here did not rest its decision on one census tract that failed to reveal significant concentrations nearby but looked to surrounding tracts and Uptown as a whole. Perhaps the relevant area could have been more precisely defined independent of census tract boundaries. The only readily available data which HUD considered reliable, however, was compiled according to census tracts and community areas, and there is no compelling evidence that the tracts relied upon painted a distorted picture of the racial and economic composition of the relevant area or that HUD's selection of tracts was made without consideration of the relevant factors. HUD's examination of tracts 321, 314, and 315 was adequate given the location of Monterey and reasonably corresponds to what would be considered the relevant area. Our review of HUD's approach cannot be posited on a theoretical plane. Rather, we must remain sensitive to the real world of administrative decision-making and keep within the bounds of common sense. To find arbitrary and capricious action, a court must be persuaded by concrete evidence, readily available to HUD during its decision-making process, that the area as defined is clearly not the relevant area and that as a result, HUD relied on a materially distorted picture of the racial and economic balance of the relevant area.[17] Plaintiffs did not satisfy that burden. Moreover, HUD considered other information pertaining to the "area" which corroborated the census data. HUD thus did not rely on census tract boundaries alone. Cf. id. at 839.
 
 
 43
 Given the slippery definition of "the relevant area," which turns on numerous objective and subjective factors, id., we are especially hesitant to find fault with HUD's approach. See Strycker's Bay, supra. The factors upon which HUD must focus are more appropriately assessed from the perspective of HUD's expertise.[18] Analysis of sociological data has never been a judicial forte. See Nucleus of Chicago Homeowners Association v. Lynn, 372 F.Supp. 147, 150 (N.D.Ill.1973), aff'd, 524 F.2d 225 (7th Cir. 1975), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 42 L.Ed.2d 734 (1976). Since plaintiffs have not established that HUD ignored the relevant factors, we defer to HUD's judgment.
 
 
 44
 Plaintiffs bear a similarly heavy burden of showing that, based on reliable information that was readily accessible to HUD when it considered the proposal, the data upon which HUD relied was clearly outdated and inaccurate. Unless plaintiffs make that showing, however, 1970 census figures are presumed to be accurate until publication of the next general census. See Gautreaux v. Chicago Housing Authority, supra.
 
 
 45
 On appeal plaintiffs stand on more current statistics detailing the racial mixture of area public schools and other subsidized housing projects. One school, they note, experienced a minority student increase from 47% in 1970 to 88.1% in 1979. Two housing projects in tract 321 showed a combined increase in minority occupancy from 47.7% in 1973 to 75.1% in 1980,[19] and four projects in tract 315, which borders on the north of tract 321, showed similar figures of 58.8% for 1972 and 80.2% for 1980.[20]
 
 
 46
 Other courts have considered public school data relevant to determining the racial composition of the area, particularly where the school is located near the project or will be attended by children from the project.[21] See, e.g., Shannon, 435 F.2d at 822; King, 464 F.Supp. at 835. But we find no authority to suggest that it is controlling or even deserving of great weight in itself. Data on occupancy of nearby subsidized housing projects is also merely one factor, the weight of which depends on other factors such as proximity, concentration of projects in the area, number of units or tenants in each, and the nature of the subsidy. Shannon, 436 F.2d at 822.
 
 
 47
 Here, neither set of statistics have been shown to be a particularly good measure of the neighborhood population. HUD's Equal Opportunity specialist testified that public school data is inherently suspect as it fails to consider the racial mix of private or parochial schools. In fact, as the district court noted, only one member of the plaintiff association has a child attending a public school. 515 F.Supp. at 1233. In King, the court credited dramatic shifts in the racial balance of nearby public schools, but did so only in the context of other "overwhelming evidence" that established a strong correlation between public school and neighborhood populations. 464 F.Supp. at 835.
 
 
 48
 Changes in the ratio of minority to non-minority tenants in subsidized housing, as such, similarly bears little, if any, direct relationship to changes in the neighborhood. Depending on the type of assistance program, the occupants are either low- or moderate-income people whose racial make-up may differ significantly from that of the surrounding community. Each developer, in addition, is required to submit and carry out an AFHMP that sets forth a marketing strategy designed to reach "families who are least likely to apply and to increase the likelihood of maintaining racial balance." 24 C.F.R. § 881.601(a).[22] The regulations also specifically prohibit local residency requirements. Id. § 881.603(b)(1); see also Gautreaux v. Chicago Housing Authority, 304 F.Supp. at 740. Moreover, occupancy reports are compiled and submitted so that HUD can monitor a project owner's efforts to meet the AFHMP projected occupancy profile. Particularly significant is that, unlike the proposed project in King, Monterey is not shown to be located in a small area that is dominated by high-rise, low-income projects with overwhelming minority populations. The closest project, for example, is Buena Apartments, at least two blocks away, which had a high percentage of minority occupants in 1980, but had only 162 minority tenants. The impact of other subsidized housing is even further diluted by the fact that the area has a relatively high population density augmented by substantial private investment in middle and upper middle class housing. See 515 F.Supp. at 1223. Despite the experience of some area projects, the Monterey AFHMP, reviewed by HUD's EO specialist, anticipated a racial mix that would not appear to contribute to any alleged impaction. We cannot say that the occupancy projection is unrealistic. See South East Chicago, 488 F.2d at 1131 (no clear error of judgment).
 
 
 49
 HUD considered other indicators of minority concentration which supported the census data, and the district court entertained evidence of the present character of the area which cast considerable doubt on plaintiffs' position. See 515 F.Supp. at 1223-24. Plaintiffs' evidence, at least at this early hour, falls far short of the "overwhelming evidence" presented to the court in King.[23] We remain unpersuaded that the district court was clearly erroneous in ruling that plaintiffs are unlikely to establish HUD's determination as arbitrary and capricious.
 
 III. State Claim: Alleged Ordinance Violation
 
 50
 The Monterey project is located within the protection district established by the Lake Michigan and Chicago Lakefront Protection Ordinance. That ordinance prohibits "any physical change, whether ... public or private, to be undertaken ... without first having secured approval therefor from the Chicago Plan Commission." Chicago, Ill., Municipal Code ch. 194B-5.1. Count III of plaintiffs' complaint alleged as a pendent state claim against the private defendants that Monterey is in violation of that ordinance because approval from the commission was not obtained prior to commencing substantial rehabilitation work.[24] The district court, however, dismissed Count III, ruling that the state statute upon which plaintiffs based their right of action, Ill.Rev.Stat. ch. 24, § 11-13-15 (1980), was inapplicable. 515 F.Supp. at 1228-29.
 
 
 51
 Section 11-13-15 provides for private enforcement "(i)n case any building ... is constructed ... or used in violation of an ordinance or ordinances adopted under Division 13, 31 or 31.1 of the Illinois Municipal Code...." (emphasis added). Division 13 of the Illinois Municipal Code empowers "the corporate authorities in each municipality" to enact zoning ordinances. Ill.Rev.Stat. ch. 24, § 11-13-1. In 1971, the Illinois General Assembly added to that enabling provision the following exemption: "This amendatory Act of 1971 does not apply to any municipality which is a home rule unit." Reading the italicized language of section 11-13-15 in conjunction with that exemption, the district court reasoned that plaintiffs do not have a right of action under section 11-13-15 because Chicago is a home rule municipality and therefore the Lakefront Protection Ordinance was not "adopted under Division 13."
 
 
 52
 Plaintiffs argue that the district court's strict interpretation is at odds with the legislative intent behind section 11-13-15 and the home rule exemption. Cf. Clark v. Uebersee Finanz-Korp., 332 U.S. 480, 488, 68 S.Ct. 174, 177, 92 L.Ed. 88 (1947) ("We are dealing with hasty legislation which Congress did not stop to perfect as an integrated whole."). We need not address this forceful argument for we believe that the Lakefront Protection Ordinance is not the type of zoning ordinance contemplated by section 11-13-15. On that basis we affirm the dismissal.
 
 
 53
 Section 11-13-1 is a typical zoning ordinance enabling act. It empowers municipalities
 
 
 54
 (1) To regulate and limit the height and bulk of buildings ...; (2) to establish, regulate and limit ... the building or set-back lines ...; (3) to regulate and limit the intensity of the use of lot areas, and to regulate and determine the area of open spaces, within and surrounding such buildings; (4) to classify, regulate and restrict the location of trades and industries and the location of buildings designed for specified industrial, business, residential, and other uses; (5) to divide the entire municipality into districts of such number, shape, area, and of such different classes (according to use of land and buildings, height and bulk of buildings, intensity of the use of lot area, area of open spaces, or other classification) as may be deemed best suited to carry out the purposes of this Division 13; (6) to fix standards to which buildings or structures therein shall conform; (7) to prohibit uses, buildings, or structures incompatible with the character of such districts; (8) to prevent additions to and alteration or remodeling of existing buildings or structures in such a way as to avoid the restrictions and limitations lawfully imposed under this Division 13....
 
 
 55
 One of the permissible purposes of zoning under Division 13 is "to insure and facilitate the preservation of sites, areas, and structures of historical, architectural and aesthetic importance."[25] Plaintiffs assert that the Lakefront Protection Ordinance "in effect divides Chicago into two 'districts,' § 11-13-1(5), on the basis of proximity to Lake Michigan" and that this "classification" conforms to the above-stated purpose.
 
 
 56
 A careful reading of the enabling act reveals the error of plaintiffs' analysis. We agree that the act permits the creation of districts to effectuate purposes such as those of the Lakefront Protection Ordinance,[26] but the classification of such districts is to be based on criteria other than the type embraced by the Lakefront Protection Ordinance. That ordinance sets forth no specific substantive restrictions as such; rather, it establishes a procedural requirement of approval by the Chicago Plan Commission. The Commission's review is guided only by a list of general purposes set forth in the ordinance and "the Fourteen Basic Policies contained in the Lakefront Plan of Chicago." Ch. 194B-6.1(e). Plaintiffs urge a broad construction of the term "or other classification" in subsection (5) to include a district wherein any "physical change" is prohibited unless approved by a board vested with substantial discretion. The enabling act, however, envisions the implementation of broad zoning objectives via specific building and use regulations. Applying the principle of ejusdem generis, we construe the general term "other classification" to be limited by the more particular preceding terms, "use of land and buildings, height and bulk of buildings, intensity of the use of lot area, (and) area of open spaces." Subsection (5), as we view it, is intended to empower municipalities to create geographic divisions, or "zones," among which the municipality may vary its exercise of the powers under subsections (1), (2), (3), and (4).
 
 
 57
 The Lakefront Protection Ordinance is more appropriately characterized as an ordinance under Division 48.2 of the Illinois Municipal Code, entitled "Preservation of Historical and Other Special Areas." Ill.Rev.Stat. ch. 24, §§ 11-48.2-1 et seq. In fact, one Illinois appellate court held that the Lakefront Protection Ordinance was "derived from" Division 48.2. See Clement v. O'Malley, 95 Ill.App.3d 824, 51 Ill.Dec. 119, 420 N.E.2d 533 (1st Dist. 1981).
 
 
 58
 In enacting that division, the Illinois General Assembly
 
 
 59
 found and declared that in all municipalities the movements and shifts of population and the changes in residential, commercial, and industrial use and customs threaten with disappearance areas, places, buildings, structures, works of art and other objects having special historical, community, or aesthetic interest or value and whose preservation and continued utilization are necessary and desirable to sound community planning for such municipalities and to the welfare of the residents thereof.
 
 
 60
 Id. § 11-48.2-1. The act grants broad powers to designate by ordinance areas having, among other things, "special historical, community, or aesthetic interest or value," and "to provide special conditions, to impose regulations governing construction, alteration, demolition and use, and to adopt other additional measures appropriate for (the) preservation, protection, enhancement, rehabilitation, reconstruction, perpetuation, or use" of the area. Id. § 11-48.2-2. As an example of "other additional measures," the act includes "appropriate and reasonable control of the use or appearance of adjacent and immediately surrounding private property within public view." Id. § 11-48.2-2(d). Section 3 of that division permits the municipality to establish a "special commission" to administer those purposes and powers, and section 4 provides for notice and a public hearing with judicial review pursuant to the Illinois Administrative Review Act, id. ch. 110, §§ 264 et seq.
 
 
 61
 The declaration of intent to the Lakefront Protection Ordinance[27] closely tracks the language of the Division 48.2 declaration of policy and grant of power. See Clement, 95 Ill.App.3d at 829, 51 Ill.Dec. at 123, 420 N.E.2d at 537. In addition, the City of Chicago delegated authority to the Plan Commission to "prepare and recommend ... a comprehensive plan" of municipal development, Ill.Rev.Stat. ch. 24, § 11-12-5, and designated the Plan Commission as the agency responsible for "administration" of the ordinance, id. § 11-48.2-3. See Clement, 95 Ill.App.3d at 829, 51 Ill.Dec. at 123, 420 N.E.2d at 537. Division 13, in contrast, provides for the creation of a "zoning commission" to prepare a proposed zoning ordinance. Once the city adopts an ordinance the commission ceases to exist, Ill.Rev.Stat. ch. 24, § 11-13-2, and the power to "enforce" the ordinance is to be vested in a zoning board of appeals, id. § 11-13-3. Whereas Division 13 envisions detailed standards and minimal discretion, Division 48.2 permits the delegation of power to make ad hoc decisions to effectuate broad policies. The power of the Plan Commission to review all proposed physical changes within the district, guided only by general statements of policy, is the type of additional regulatory measure contemplated by Division 48.2. Clement, 95 Ill.App.3d at 830, 51 Ill.Dec. at 124, 420 N.E.2d at 538.
 
 
 62
 The Lakefront Protection Ordinance is not of the Division 13 variety.[28] We therefore affirm the district court's dismissal of the state claim since section 11-13-15 does not establish a private right of action for violations of ordinances enacted under, or in the nature of ordinances enacted under, Division 48.2.
 
 IV. Conclusion
 
 63
 For the foregoing reasons, the decision of the district court is affirmed with the exception that this cause is remanded for dismissal of plaintiffs' claim that Monterey violates the high-rise prohibition.
 
 
 
 *
 The Honorable Terence T. Evans, District Judge for the Eastern District of Wisconsin, is sitting by designation
 
 
 [1]
 Section 3608(d)(5) of the Fair Housing Act expressly prescribes that the Secretary of HUD "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." One of the purposes of the Act is to replace ghettos "by truly integrated and balanced living patterns." 114 Cong.Rec. 3422 (remarks of Sen. Mondale)
 
 
 [2]
 The Monterey apartments are situated in the northeast corner of tract 321. Tract 321 is bounded to the east by tract 314, to the north by tract 315 and the eastern part of tract 316, to the west by tract 320, and to the south by tract 607 and the eastern part of tract 606
 
 
 [3]
 We express no view on whether plaintiffs' alleged injury could survive a motion for summary judgment. Nor are we called upon to define the relevant neighborhood or neighborhoods which may be affected by the various injuries alleged. See Havens Realty Corp. v. Coleman, 455 U.S. 363, ----, 102 S.Ct. 1114, 1123, 71 L.Ed.2d 24 (1982)
 
 
 [4]
 This court's recent decision in South East Lake View does not mean that plaintiffs' claim based on alleged zoning ordinance violations is rendered nonjusticiable by the completion of the project. Unlike in South East Lake View, there is a substantial likelihood that plaintiffs' alleged injury would be redressed. It does not strain credibility to believe that the Chicago Plan Commission might disapprove all or part of the rehabilitation and seek abatement, which it may obtain under Illinois law. Ill.Rev.Stat. ch. 24, § 11-1-1 (1979); see O'Laughlin v. City of Chicago, 65 Ill.2d 183, 192-93, 2 Ill.Dec. 305, 309.10, 357 N.E.2d 472, 476-77 (1976) (case not moot)
 
 
 [5]
 The Fair Housing Act contemplates APA review of all HUD operations thereunder. 114 Cong.Rec. 2273
 
 
 [6]
 Insofar as it grants neighborhood standing to seek review of HUD decisions under the Fair Housing Act, Shannon has been cited with approval by the Supreme Court in Gladstone, Realtors, 441 U.S. at 114 n.28, 99 S.Ct. at 1615, and Trafficante, 409 U.S. at 211, 93 S.Ct. at 367
 
 
 [7]
 Senate Report at 2, U.S.Code Cong. & Ad.News 1974, at 4274; see 42 U.S.C. § 5301
 
 
 [8]
 The House Report expresses the concern of Congress:
 The committee wishes to reaffirm its strong support for the administration of assisted housing programs in a manner that is consistent with and in support of locally developed housing assistance plans. The Housing and Community Development Act of 1974 represented a major breakthrough in tying together for the first time both housing activities and community development. Communities have made major strides in developing realistic housing plans, only to be frustrated by inadequate housing resources and other problems associated with implementing the section 8 program.
 H.Rep.No.95-236, 95th Cong., 1st Sess., 14, reprinted in (1977) U.S.Code Cong. & Ad.News 2884, 2897.
 
 
 [9]
 One commentator viewed the preamble to the Housing and Community Development Act as a legislative endorsement of Shannon v. HUD, 436 F.2d 809 (3d Cir. 1970). Landreth, Four Elements-Planning, Citizen Participation, Housing Assistance and A-95 Review-Under Title I of the Housing and Community Development Act of 1974, 9 Urb.Law. 61, 108 (1977). In Shannon, the Third Circuit granted standing to a neighborhood group to challenge HUD rent subsidies and mortgage insurance on the basis that the approved project would increase the "already high concentration of low-income black residents" in the area. 436 F.2d at 812. The court noted that the plaintiffs, "perhaps more than the ... potential occupants of the new housing, are vitally affected by the particular program of community improvement." Id. at 818
 
 
 [10]
 In the history to the Housing and Community Development Act of 1974, Congress also articulated the need to develop viable urban communities through, inter alia, "increased neighborhood diversity." House Conference Report No. 93-1279, Aug. 12, 1974, at 1, reprinted in (1974) U.S.Code Cong. & Ad.News 4273, 4449
 
 
 [11]
 This section was omitted in the 1974 revision, which superseded the Act of 1937
 
 
 [12]
 Even the commentator plaintiffs cite criticizes high-rise elevator buildings not because they breed crime which might spill over into the surrounding community, but because the design renders the inhabitants vulnerable to crime and results in a higher maintenance burden:
 One of the more alarming aspects of high-rise developments is the danger of raising children in them.... (By contrast to children in middle-income families), children of low-income families are generally unattended. The rule system for expected behavior is often minimal and sporadically enforced. Inclement weather means their play is restricted to building interiors. It should not be surprising to find that much of the vandalism and resulting maintenance costs in housing projects is laid to the mischief of children. Most recently the elevators of high-rise, low-income apartment buildings have become the new frontier of exploratory recreation for young teen-agers. The result has been nothing less than calamitous: children have died from falls and decapitations and have suffered broken limbs and dismemberment. The damage to elevator equipment has been equally devastating. Youngsters not only commonly removed elevator doors entirely, but have found ways to anchor cables so that the elevator motors and pulleys tear the caps from their railings-ripping apart an entire elevator shaft for the full height of the building.
 O. Newman, Defensible Space: Crime Prevention Through Urban Design 189 (1972).
 The legislative history also indicates that the problem with high-rise public housing is the opportunity created for crime within. "Entrance lobbies, elevators, stairwells, and hallways and roofs are all danger areas." 123 Cong.Rec. 14372 (remarks of Rep. Richmond on related crime prevention amendment).
 
 
 [13]
 We assume for the purpose of this appeal that Congress did not intend to restrict access to judicial review under the APA of any of the federal claims asserted. Cf. Society Hill Civic Association v. Harris, 632 F.2d 1045, 1055-57 (3d Cir. 1980) (Relocation Act and parallel regulations under section 8)
 
 
 [14]
 We thus do not decide the conditions under which exists an "undue concentration" of minority or assisted persons. Compare Otero, supra, and King, supra (racial "tipping" found) with Aersten, supra (no undue concentration of assisted persons). See generally Note, Economic Tipping: An Approach to a Balanced Neighborhood, 4 Fordham L.J. 167 (1975)
 
 
 [15]
 The statement did not define the area to which it referred
 
 
 [16]
 In Gautreaux v. Landrieu, Nos. 66-C-1459 & 1460 (N.D.Ill. Feb. 27, 1981) (Mem.Op.), appeal docketed, No. 81-2223 (7th Cir. July 30, 1981), the court approved a proposed consent decree which designates Uptown as in a "Revitalizing Area." Revitalizing refers to "areas which have substantial minority population and are undergoing sufficient redevelopment to justify the assumption that these areas will become more integrated in a relatively short time ... (T)hey are considered the most promising neighborhoods for racial and economic residential integration."
 
 
 [17]
 The cases cited by the court in King also do not support the imposition of such a rigid obligation, but hold only that artificial boundaries may not be used as a device or an excuse to perpetuate segregation. See 464 F.Supp. at 839-40 (cases cited therein)
 
 
 [18]
 By way of testimony at the hearing, plaintiffs offered widely varying definitions of the relevant area. The district court concluded that in many instances those boundaries were drawn in order to depict the desired scenario of minority and low-income concentration. 515 F.Supp. at 1220. This is precisely the type of "gerrymandering" that prompted the decision in King
 
 
 [19]
 Not included in these figures is Sherway Towers, a housing project for the elderly, which first reported in 1980 an occupancy of 70 non-minority and 21 minority tenants
 
 
 [20]
 At the hearing below, plaintiffs offered other data to contradict HUD's determination, but the court concluded that there was no evidence of its reliability. 515 F.Supp. at 1220-21. Plaintiffs make no argument on that finding, nor do they attempt to rely on that data on appeal. They also do not attack the statistics HUD used to determine the concentration of assisted persons. See id. at 1221-22, 1231-32
 
 
 [21]
 Plaintiffs limit their use of these statistics to show a change in the racial composition of the neighborhood surrounding Monterey. They do not argue that Monterey will contribute to or cause racial segregation in the public school system or otherwise interfere with any desegregation plan. Cf. Jones, 378 F.Supp. at 290 n.4; Lee v. Nyquist, 318 F.Supp. 710 (W.D.N.Y.1970), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971)
 
 
 [22]
 The AFHMP form states that the "purpose of this program is to assure that any group(s) of persons normally NOT likely to apply for the housing without special outreach efforts (because of existing neighborhood racial or ethnic patterns, price, and/or other factors ) know about the housing, feel welcome to apply and have the opportunity to buy or rent."
 
 
 [23]
 Plaintiffs urge this court to take judicial notice of 1980 census statistics which, they say, show that the 1970 census data is clearly outdated. We decline to do so. A reviewing court cannot invoke the benefit of hindsight to condemn as arbitrary and capricious an action taken by HUD. That HUD may have been wrong is not the issue, but rather whether HUD's decision was clearly disputed by reliable information readily available at that time. King, 464 F.Supp. at 841
 
 
 [24]
 Plaintiffs placed further reliance on this alleged violation in Counts I and II where they claimed that HUD failed to fulfill its duty under 12 U.S.C. § 1715l (d)(2) and 24 C.F.R. § 881.207(f) to approve only projects that comply with all applicable local ordinances. Plaintiffs do not raise this argument on appeal. We therefore express no view on the district court's conclusion that there is no evidence that HUD "abused its discretion." See Davis v. Romney, 490 F.2d 1360, 1368 (1st Cir. 1974) (not deciding whether "reasonable effort" to ascertain compliance is sufficient)
 
 
 [25]
 This language was added to the list of purposes by P.A. 77-1373, § 1, effective August 31, 1971
 
 
 [26]
 Among other purposes, the ordinance was adopted "(t)o promote and protect the health, safety, comfort, convenience, and the general welfare of the people, and to conserve our natural resources." Chicago, Ill., Municipal Code, ch. 194B-3(a)
 
 
 [27]
 "Lake Michigan and the Lakefront of the City of Chicago are hereby designated a district having special environmental, recreational, cultural, historical, community, and aesthetic interests and values. It is the express intention of this Ordinance to insure the preservation and protection of that district and of every aspect of its interest and value." Chicago Ill. Municipal Code, ch. 194B-1
 
 
 [28]
 Plaintiffs cite two Illinois cases which refer to the Lakefront Protection Ordinance as a "zoning ordinance," see Kramer v. City of Chicago, 58 Ill.App.3d 592, 16 Ill.Dec. 157, 374 N.E.2d 932 (1st Dist. 1978); American Nat'l Bank v. City of Chicago, 19 Ill.App.3d 30, 311 N.E.2d 325 (1st Dist. 1974), but that does not necessarily imply that the ordinance is a Division 13-type ordinance. "Zoning ordinance" is a generic term for all ordinances which create areas in a city designated for particular buildings, enterprises, or activities, and may properly describe enactments under Division 48.2 as well. See Rebman v. City of Springfield, 111 Ill.App.2d 430, 250 N.E.2d 282 (4th Dist. 1969)